Frank S. McCullough, J.
This action was instituted by the plaintiffs as taxpayers of the City of Yonkers pursuant to section 51 of the General Municipal Law. The City of Yonkers is gov *692 erned "by a Common Council consisting of 12 Councilmen and the Mayor who is the presiding officer of the Council.
The petitioners in this proceeding seek to enjoin and restrain the defendants from adopting, approving, enforcing or putting into effect any local laws amending or changing the provisions of sections 3 and 4 of article I of the Charter of the City of Yonkers setting forth the boundaries of the wards into which the City of Yonkers is divided and the provisions regulating the amendment of such ward lines, and enjoining and restraining the defendants from holding any public hearing on December 27, 1962, on two public laws amending the provisions of sections 3 and 4, respectively, of article I of the Charter of the City of Yonkers, and restraining the defendants from doing or performing any and all other acts intended to be done or performed pending the determination of this action. The City of Yonkers, through the Corporation Counsel, opposes the application and moves for judgment on the pleadings pursuant to rule 112 of the Buies of Civil Practice.
The matter was orally argued on the return day and briefs submitted by both parties.
The Charter of the City of Yonkers was adopted in a city-wide referendum held in the general election on November 7, 1961, by a vote of 25,507 to 19,120, and became effective January 1, 1962. The proposed charter was submitted by a Charter Bevision Commission appointed by the Mayor pursuant to section 20 (subds. 3, 4) of the City Home Buie Law which became effective March 9,1961 (L. 1961, ch. 87). That law authorizes the Mayor of a city to appoint a Charter Bevision Commission which could propose a new city charter for submission to the electorate in a city-wide referendum. The applicability of this law to the City of Yonkers was sustained in Klein v. Mayor of City of Yonkers (217 N. Y. S. 2d 859, affd. 14 A D 2d 885).
The charter provided for the creation of 12 wards whose boundaries were described by street boundaries. The charter also provided that each ward would be entitled to one representative who would be elected on a ward representation basis, and it also provided that the Mayor was to be elected on a citywide basis.
The City of Yonkers is governed by a Common Council, as stated above, consisting of 12 Councilmen and the Mayor, who is the presiding officer of the Council. The city is presently divided into 12 wards, the voters in each ward electing one Councilman. The Common Council appoints a City Manager by majority vote and the latter official appoints most of the administrative officials of the city, including the Comptroller, Corporation Counsel, *693 Commissioner of Public Safety, Commissioner of Public Health, City Engineer, Planning Director and others. These officials serve at the pleasure of the City Manager and the City Manager serves at the pleasure of the Common Council.
The moving papers recite the fact that for several years prior to 1961 there was a strong demand for reapportionment and equalization of ward areas. Shifts in population apparently have resulted in a disproportionate distribution of population among the various wards.
In April, 1961 the Mayor of the City of Yonkers appointed a Charter Revision Commission pursuant to section 20 of the City Home Rule Law. Public hearings were held and ultimately the commission filed with the City Clerk a proposed new city charter for submission to a referendum on November 7, 1961. New ward boundaries were set forth in the proposed charter. The following provisions were included to provide a procedure for future changes of ward boundaries: (i) In December, 1964 and every eight years thereafter the Mayor shall appoint a commission of five members, two of whom shall be members of the Common Council, not more than one of whom shall be of the same political party, and three citizens of the city, not more than two of whom shall be of the same political party. The Mayor shall designate the chairman of the commission, (ii) The commission shall prepare new ward boundaries which shall effect an equitable division of registered voters among the wards of the city, so that no ward shall have more or less voters than 10% of a number to be determined by dividing the number of voters registered to vote in the city, (iii) Any registered voter could compel the filing of a plan for new ward boundaries by the commission. (iv) If the Common Council does not adopt the plan within 60 days after it has been filed, it must be submitted to the voters in a referendum in the next general election.
The referendum resulted in the adoption of the new charter by the voters on Election Day, 1961, and the charter became effective January 1,1962. However, although the 1962 elections were held under new ward lines, no municipal elections have taken place since the adoption of the charter, since the next local election is scheduled for November, 1963. It appears that early this month seven members of the Common Council filed with the City Clerk two proposed local laws sponsored by said Councilmen designed to amend sections 3 and 4 of article I of the charter. On December 11, 1962 the Mayor of the City of Yonkers indicated his preference for the public hearing to be held on January 22,1963, but this proposal was defeated seven to six at the Common Council meeting on December 11, 1962, and instead a reso *694 Iution fixing the date for the public hearing as December 27,1962 was approved.
The plaintiffs seek to enjoin the proposed public hearing and to restrain the defendants from performing any of the acts allegedly intended to be done, pending a trial of this action.
It might be well at this point to briefly set forth the pertinent provisions of the city charter sought to be amended.
Section 3 of article I directs that the city shall be divided into 12 wards, the boundaries of which are defined.
Section 4 of article I of the charter is entitled “ Mandatory Beapportionment.” This section provides the procedure for future changes of ward boundaries. It provides in part that: “ (i) In December 1964 and every 8 years thereafter the Mayor shall appoint a commission of five members, two of whom shall be members of the Common Council, not more than one of whom shall be of the same political party, and three citizens of the city, not more than two of whom shall be of the same political party. The Mayor shall designate the chairman of the commission, (ii) The commission shall prepare new ward boundaries which shall effect an equitable division of registered voters among the wards of the city, so that no ward shall have more or less voters than 10% of a number to be determined by dividing the number of twelve into the total number of voters registered to vote in the city.”
The proposed legislation would amend section 3 of article I, by prescribing new ward boundaries.
It would also amend section 4 of article I by substituting a new mandatory reapportionment provision which amends the existing law by removing from the Mayor the sole power of appointment of a Charter Commission and by providing that such appointment shall be subject to the consent of the Common Council, together with other changes.
Turning first to the change of ward lines (§3), plaintiff contends that such change can only take place pursuant to the provisions of section 4, under the mandatory reapportionment section as it is now constituted. The court disagrees with such reasoning. In the opinion of the court, section 4 sets up a procedural remedy for periodic review to effect an equitable division of registered voters among the wards of the city.
Plaintiffs base their position on section 21 of the City Home Buie Law which provides, in part: “ Notwithstanding any provision of this chapter, the local legislative body of a city shall not be deemed authorized by this chapter to adopt a local law which * * * a. Amends the charter of the city contrary to any provisions of such charter regulating its own amendment.”
*695 The charter as submitted by the City Charter Commission and approved by the electorate contains no specific provisions as to the method of amendment of the city charter.
In the absence of any charter provision regulating its own amendment, the following language in Baldwin v. City of Buffalo (6 N Y 2d 168,174) is applicable: “ Hence we conclude that the alteration of ward boundaries is properly an affair of the municipality. A contrary construction of the Constitution — that the State Legislature may change district lines for local elections in every city of the State — leaves the citizens of these communities with virtually no redress or remedy where these boundaries are altered against their will. However, with this power properly residing in the local government, the citizens have an immediate and effective remedy, since they may remove those local officials who tamper with district lines contrary to their will in the next succeeding election.”
The changing of ward boundary lines is a legislative function within the scope of the authority granted to cities under the Constitution and the City Home Buie Law. As is stated in Cooley’s, Constitutional Limitations (8th Ed., Vol. 1, pp. 345-346): “ The courts are not the guardians of the rights of the people of the State, except as those rights are secured by some constitutional provision which comes within the judicial cognizance. The protection against unwise or oppressive legislation, within constitutional bounds, is by an appeal to the justice and patriotism of the representatives of the people. If this fail, the people in their sovereign capacity can correct the evil; but courts cannot assume their rights ”.
The plaintiffs raise the additional objection to the realignment of ward boundaries citing subdivision 1 of section 15 of the City Home Buie Law which reads as follows: “ Except as otherwise provided by or under authority of an act of the legislature, a local law shall be subject to mandatory referendum if it: 1. Changes the form or composition of the local legislative body or increases or decreases the number of votes which any member is entitled to cast.”
This argument has been disposed of by the holding of the Court of Appeals in Lane v. Johnson (283 N. Y. 244) and People ex rel. Platt v. Eilert (283 N. Y. 770). These cases hold that the respective acts incorporating the City of Peekskill and the City of Bye did not change the form or composition of the elective body of the County of Westchester, even though Peekskill was entitled to two Supervisors and the City of Bye entitled to one Supervisor who in turn, became members of the County Board of Supervisors. In the cited cases it was the contention of the *696 unsuccessful parties that the addition of Supervisors was a change in the form or composition of the elective body of the county and therefore called for a permissive county-wide referendum.
The changing of ward boundary lines likewise does not constitute a change in the form or composition of the local legislative body. The Court of Appeals in Baldwin v. City of Buffalo (supra, p. 175) stated: “ Since, then, the changing of the ward boundary lines affects neither the mode of selection of members of the Erie County Board of Supervisors, nor the mode of selection of members of the City Council, the local laws are a valid exercise of the power granted to the municipality under the provision of the State Constitution, and do not require a mandatory referendum ”.
It logically follows therefore that the change of boundary lines does not come within section 15, which calls for a mandatory referendum.
The plaintiffs contend that the public hearings scheduled for December 27, 1962, and the anticipated action by the legislature to enact the two proposed local laws have been illegally called because of the failure of proper notice pursuant to section 13 of the City Home Buie Law. Subdivision 5 of that statute states: “5. In a city the mayor of which is not vested with the power of vetoing local laws, no local law shall be passed by the local legislative body until a public hearing thereon has been had before such body; and in every other city no such local law shall be approved by the mayor until a public hearing thereon has been had before the mayor. Notice of the public hearing shall be given by the mayor within ten days after the local law shall have been presented to him and the hearing shall be held within twenty days after such presentation. Such public hearing shall be on such public notice of at least three days as may be prescribed by a local law on which a hearing shall have been held as prescribed by this section, upon five days’ notice.”
It appears that after the proposed legislation was introduced the Mayor sought to set a hearing for January 22,1963, but that the Council majority instead adopted a resolution fixing the date of December 27, 1962. No notice was given by the Mayor of the hearing that has been scheduled for December 27, 1962. The court has caused an examination to be made of the legislative jacket pertaining to section 13 and its amendments and there is no memorandum which indicates the intent of that section. The section is poorly drawn and the absence of a memorandum in the legislative jacket makes judicial interpretation of the statute difficult.
*697 As pointed out in Matter of Pillion v. Magee (175 Misc. 698, 700), the requirement of a hearing “ emphasizes the legislative intent that the public shall have an opportunity to express their views before the proposed legislation becomes a Liw.” If the statute were to be construed that the Mayor in the City of Yonkers must have a hearing after the passage of local laws it would mean there would be two hearings on every local law that was passed. The provision for a public hearing before the Mayor relates to situations where the Mayor has the power of veto. The obvious intent of the section is to give the public an opportunity to be heard on the legislation. This will be accomplished by the proposed public hearing to be held on the 27th, notice of which was given pursuant to Local Law No. 1 —1940. The court therefore holds that there has been no failure of compliance with the statutory requirements as to the holding of the public hearing.
We come now to the question of the proposed amendment to section 4 of article I of the City Charter which deals with mandatory reapportionment. Under that section, as it is now constituted, the Mayor has the power and the duty to appoint a commission before the 31st day of December, 1964, and every eight years thereafter, which commission is to prepare new ward boundaries to create an equitable division of registered voters among the wards of the city. The proposed local law dealing with mandatory reapportionment recites that the Mayor’s power to appoint such commission shall be subject to the advice and consent of the Common Council. Other changes are also proposed with respect to the Mayor’s power including the delay in the appointment by the Mayor of the commission for two years, and the removal of his power to appoint the chairman of the commission. Section 15 of the City Home Buie Law provides in part that a local law shall be subject to a mandatory referendum if it: “5. Abolishes, transfers or curtails any power of an elective city officer.”
The Mayor of the City of Yonkers is an elective city officer. In the opinion of the court, the proposed restrictions on the Mayor would represent a curtailment of his power. Accordingly, the court finds that under section 15 of the City Home Buie Law, the proposed amendment to section 4 of article I of the City Charter by local law alone is illegal by reason of the failure to provide for a city-wide referendum. The court does not consider subdivision (b) of section 7 of article III of the charter to be applicable to the mandatory reapportionment provision.
The defendants have moved for judgment on the pleadings and plaintiffs have joined in the motion which, in effect, submits *698 to the court for its determination on the merits, the issues involved, in the controversy.
The court holds therefore that the Council does have the power to enact a local law effecting a change in ward boundaries in the manner prescribed by the proposed legislation but that it does not have the legal right to amend section 4 of article I of the Yonkers City Charter in the manner set forth in the proposed local law.