Price v. New York State Board of Elections

**UNITED STATES COURT OF APPEALS**

FOR THE SECOND CIRCUIT

_____

August Term, 2007

(Argued: March 13, 2008                              Decided: August 22, 2008)

Docket No.  07-5367-cv

_____

DAVID PRICE, AS A CANDIDATE FOR THE POSITION OF ALBANY COUNTY REPUBLICAN
COMMITTEEMAN FROM THE 14TH WARD 6TH DISTRICT, CITY OF ALBANY, THE ALBANY COUNTY
REPUBLICAN COMMITTEE, MARTHA MCMAHON, ABSENTEE VOTER, AND JAMES THORNTON,
ABSENTEE VOTER,

*Plaintiffs-Appellants*,

— v .—

THE NEW YORK STATE BOARD OF ELECTIONS, NEIL W. KELLEHER, DOUGLAS A. KELLNER,
EVELYN J. AQUILA, AND HELENA MOSES DONOHUE,

*Defendants-Appellees*.

_____

Before:          B.D. PARKER and LIVINGSTON, *Circuit Judges*, and J. HALL, *District Judge*.[*]

_____

A candidate, two voters, and the Albany County Republican Committee brought suit against the New York State Board of Elections.  Plaintiffs challenged, on First Amendment grounds, a state law prohibiting the use of absentee ballots in elections for county committee members. The United States District Court for the Northern District of New York (Sharpe, *J.*) rejected the plaintiffs'

_____

[*] The Honorable Janet C. Hall, United States District Judge for the District of Connecticut, sitting by designation.

arguments and dismissed the Complaint. We reverse. Judge Livingston dissents in a separate opinion.

REVERSED AND REMANDED.

_____

THOMAS MARCELLE, Albany, NY, *for Plaintiffs-Appellants*.

TODD VALENTINE, Special Counsel, New York State Board of Elections, Albany, NY, *for Defendants-Appellees*.

_____

J. HALL, *District Judge*:

Voters in New York State may vote by absentee ballot in every kind of election save one: elections for political party county committees. The plaintiffs, who are two voters, the Albany County Republican Committee ("ACRC"), and a candidate for the ACRC, claim that the State has infringed their First Amendment rights through this omission, without adequate justification. The district court rejected the plaintiffs' arguments, and it concluded that the State's explanation was constitutionally sufficient. We reverse.

I.

In every county in New York, the political parties are each represented by a county committee. As a general matter, the party committees "prepare rules for governing the[ir] party within [their] political unit[s]." N.Y. Elec. Law § 2-114(1). These committees also have several specifically defined tasks, including the responsibility for selecting the party's nominee for certain local offices, in the rare situations when such an office becomes vacant between early July and early

November in a year when that office is up for election. *See id.* § 6-116.[1]

If the county committee is required to make such a nomination, it has a relatively short time period in which it may act. When the vacancy occurs more than seven days before the date of the primary election, the county committee cannot act before the primary election, but it also must act within seven days after the primary election. *Id.* §§ 6-116; 6-158(6). When the vacancy occurs less than seven days before the primary election, the committee must make its nomination within fourteen days after the vacancy is created, although the committee must still wait until the primary election before it may act. *Id.* §§ 6-116; 6-158(6). The committee also has fourteen days to act if a vacancy is created after the primary election. *Id.* §§ 6-116; 6-158(6).

County committee elections operate on a small scale. Each county is broken into a number of tiny election districts ("EDs") that contain no more than 1150 registered voters. *Id.* § 4-100(3)(a). In Albany County, the ACRC elects two committee members from each of the county's 349 EDs. Every member is selected biannually, in even numbered years, in an election held coterminously with the regularly scheduled primary election. The undisputed evidence before the district court showed that in a typical election cycle, there are usually only 3 or 4 EDs in all of Albany County that have

---

[1] More specifically, if (1) a vacancy occurs in a local elected office; and (2) the vacancy is required to be filled at the next scheduled general election; and (3) the vacancy occurs after the deadline for candidates to circulate nominating petitions (or within seven days of that deadline); then the county committee is responsible for determining the party's nominee for the elected office. N.Y. Elec. Law § 6-116. Because of New York's election calendar, such a vacancy can only occur between early July and early November. *See id.* § 6-158(1) (setting the deadline to circulate nominating petitions as the "ninth Thursday preceding the primary election"); *id.* § 8-100(1)(a) (setting the date of the primary election as "the first Tuesday after the second Monday in September"); *id.* § 8-100(1)(c) (setting the date of the general election as "the Tuesday next succeeding the first Monday in November").

3

contested elections for the ACRC.

For the vast majority of elected offices in New York, the election calendar builds in a "transition period" for incoming officeholders. That is, after an election takes place, there is usually a period of several weeks (or more) during which the outgoing officeholder remains in office until his successor is sworn in. By creating this transition period, the State ensures that an office does not become vacant between election day and the date when the incoming official is certified as the winner of the election.

County committee positions work differently. For reasons that are not entirely clear, committee members only "hold office until the next election at which members of the committee are elected." *Id.* § 2-106(4). As a result, when there are contested elections for seats on the committee, those seats will be vacant between the day of the primary election and the day that the election results are certified.[2] *See Settineri v. DiCarlo*, 624 N.E.2d 683, 683 (N.Y. 1993), *adopting the analysis stated in* 605 N.Y.S.2d 95, 97 (N.Y. App. Div. 1993) (Balletta, *J.*, dissenting). This vacancy period can last up to nine days. *See* N.Y. Elec. Law § 9-200 (allowing the local boards of election up to nine days to complete their canvass of the election and certify the results).

County committee elections are unique in another respect. In elections for all positions other than county committee members, New York permits voters to cast an absentee ballot if they can

---

[2] When an ED has an uncontested race, however, the seats in that ED will not have a vacancy because the unopposed candidates are automatically elected at the primary election. *See* N.Y. Elec. Law § 6-160.

present one of several valid excuses.[3] *See id.* § 8-400. These ballots are counted if they are postmarked before election day, and if they are received by the local board of elections within seven days after election day. *Id.* § 8-412(1). In county committee elections, however, absentee ballots are expressly prohibited. *Id.* § 7-122.

## II.

There are three categories of plaintiffs in this case. Plaintiff David Price was a 2006 candidate for a position representing ED 14-6 on the ACRC. Two other plaintiffs, Martha McMahon and James Thornton, are individual voters in ED 14-6 who wished to cast absentee ballots in the 2006 election. The remaining plaintiff is the ACRC. The defendants are the state Board of Elections and its officials.[4]

In 2006, the primary election was scheduled for September 12. Four days before the election, the plaintiffs filed the Complaint in this case and sought a Temporary Restraining Order ("TRO") requiring the county elections board to distribute absentee ballots for the race in ED 14-6. The district court granted the TRO on September 11, and it instructed the Albany County Board of Elections[5] to give the voter-plaintiffs a supplemental paper ballot for the relevant committee member

[3] Valid reasons include "unavoidable" absences related to a voter's "duties, occupation, business, or studies," N.Y. Elec. Law § 8-400(1)(a), absences due to vacation, *id.* § 8-400(1)(b), absences due to illness or disability, *id.* § 8-400(1)(c)-(d), absences due to the need to accompany a relative to the polls, *id.* § 8-400(1)(e), and absences due to incarceration, *id.* § 8-400(1)(f).

[4] The individual defendants are sued in their official capacities only.

[5] At the time the district court issued the TRO, the Albany County Board of Elections was a named defendant. Subsequently, the parties agreed to dismiss the local elections board from the case, with the understanding that the local board has agreed to be bound by the outcome in the lawsuit.

race.  However, the court also instructed the county elections board that it could not count these supplemental ballots until the court allowed it.

The plaintiffs also sought relief in addition to the TRO.  Specifically, plaintiffs sought a declaratory judgment that Election Law § 7-122 was unconstitutional, $1 in nominal damages for each plaintiff, and an injunction against the enforcement of Election Law § 7-122.

Following the election,[6] the plaintiffs moved for summary judgment.  In support of their motion, the plaintiffs attached declarations from the Chairman of the ACRC and the Commissioner of the Albany County Board of Elections.  The defendants submitted no evidence of their own in opposition.  Instead, they cross-moved to dismiss the Complaint.

The district court granted the defendants' Motion to Dismiss and denied the plaintiffs' Motion for Summary Judgment.  *Price v. N.Y. State Bd. of Elections*, No. 06-cv-1083, 2007 WL 3104327, at *13 (N.D.N.Y. Oct. 22, 2007).  To guide its inquiry, the district court applied the framework articulated in *Burdick v. Takushi*, 504 U.S. 428 (1992). *Price*, 2007 WL 3104327, at *5.  Accordingly, the district court explained that it would apply strict scrutiny if the New York law severely burdened the plaintiffs' rights, and a lesser standard of review otherwise. *Id.* (citing *Lerman v. Bd. of Elections*, 232 F.3d 135, 145 (2d Cir. 2000)).

The district court then concluded that Election Law § 7-122 did not severely burden any of the plaintiffs' rights.  In large part, the district court relied on the Supreme Court's opinion in

---

[6] ED 14-6 has 27 registered Republicans.  On election day in 2006, twelve of these voters turned out to vote (not including McMahon and Thornton).  Unofficial results show that Price received ten votes, while the other two candidates each received seven votes.  McMahon and Thornton's votes could thus be outcome determinative for the second seat.

*McDonald v. Board of Election Commissioners*, 394 U.S. 802 (1969), which the district court read as holding that "restrictions on access to absentee ballots do not severely burden the right to vote, so long as the class of voters to whom absentee ballots are denied are not thereby deprived of their only method of voting." *Price*, 2007 WL 3104327, at *7. The district court therefore concluded that the claims of the voter-plaintiffs (McMahon and Thornton) could not be subjected to strict scrutiny. *Id.* The court also concluded that the statute did not severely burden candidate Price or the ACRC. *Id.*

The district court then proceeded to determine what lesser standard of review was applicable. *Id.* at *8. The court explained that, because Election Law § 7-122 burdened voting rights, it would be inappropriate to apply "a purely deferential review" to the challenged statute. *Id.* However, because the court deemed the burden on the plaintiffs' rights to be "*de minimis*," the court stated that its review would be "far closer to a purely deferential review than it is to strict scrutiny." *Id.*

Notwithstanding the court's comments that it would apply something *close* to purely deferential review, the court referred to its analysis as "rational basis review," *id.* at *9, and it cited equal protection cases from outside of the voting rights context in order to develop the meaning of that standard. *See id.* (citing *Heller v. Doe*, 509 U.S. 312, 319-20 (1993), and *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 313-14 (1993)). Thus, in the district court's view, the New York law had to be sustained if there were any "'plausible reasons' for the challenged legislative action." *Id.* (quoting *F.C.C.*, 508 U.S. at 313-14).

Applying this rational basis standard, the district court held that the statute was constitutional. The court explained that if absentee ballots were permitted in county committee races, the local

7

boards of election would be unable to certify the results of these races until at least seven days after the election. *Id.* During this seven day window, the county committee positions would be vacant, which would pose a problem in those rare situations when the committee was required to act to nominate a candidate during that same seven day window. *Id.* at \*10-12. Thus, the court found that the legislature could have rationally sought to avoid this problem when it precluded the use of absentee ballots. *Id.* at \*13.

Following the district court's ruling, plaintiffs filed a notice of appeal. Plaintiffs also asked the district court to stay its judgment pending appeal, and the district court agreed. To date, the local board of elections has not yet finally tabulated the results of the election, and no winner has been declared in ED 14-6.

III.

In evaluating the district court's dismissal of the Complaint, we engage in *de novo* review. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). We must accept all factual allegations in the Complaint as true. *Id.* Dismissal is only warranted if the facts as alleged are insufficient to "raise a right to relief above the speculative level." *Id.*

This court similarly engages in *de novo* review of the district court's denial of the cross-motion for summary judgment. *Eli Lilly Do Brazil Ltda v. Fed. Express Corp.*, 502 F.3d 78, 81 (2d Cir. 2007). The burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *White v. ABCO Eng'g Corp.*, 221 F.3d 293, 300 (2d Cir. 2000). Once the moving party has met its burden, the nonmoving party must present evidence that

8

shows that there is a genuine issue for trial. *Anderson*, 477 U.S. at 255; *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

A.      *First Amendment Rights and The* Burdick *Standard*

On appeal, the plaintiffs do not assert a general right to obtain absentee ballots. Instead, they press three related claims under the First Amendment,[7] all of which stem from the simple observation that some voters can find it difficult to cast an in-person ballot in county committee elections. The voter-plaintiffs argue that the lack of absentee balloting constitutes a burden, at least to some degree, on their associational right to vote for a political party position.[8] Price asserts that his associational rights are burdened because it is difficult for him to fully associate with all of the voters who wish to cast votes to support his candidacy. Finally, the county committee asserts that its associational rights have been burdened because some Republican voters who wish to cast ballots in committee races find it difficult to do so.

While one can debate the extent to which the plaintiffs' associational rights are burdened, there can be no real debate that all of the plaintiffs' First Amendment rights have been burdened to some degree. All "[e]lection laws will invariably impose some burden upon individual voters." *Burdick*, 504 U.S. at 433. Every provision of a state elections code, "whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects–at least to some degree–the individual's right to vote and his right

---

[7] The plaintiffs' Complaint also advanced an equal protection argument, but the plaintiffs abandoned that claim at oral argument.

[8] For voters who are hospitalized, housebound, or incarcerated, this burden could be quite significant.

to associate with others for political ends." *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983).

In this case, the burdens on the plaintiffs can be easily identified. The voter-plaintiffs have an associational right to vote in political party elections, *see N.Y. State Bd. of Elections v. Lopez-Torres*, 128 S. Ct. 791, 798 (2008); *Kusper v. Pontikes*, 414 U.S. 51, 57-58 (1973), and that right is burdened when the state makes it more difficult for these voters to cast ballots. *See Kusper*, 414 U.S. at 58. Similarly, candidates' associational rights are affected, in at least some manner, when barriers are placed before the voters that would elect these candidates to party positions. *See Anderson*, 460 U.S. at 786 (explaining that the associational rights of candidates and voters are generally similarly burdened by election laws). And it is well-established that a political party's associational rights are affected when the party's nomination process, and its mechanisms for selecting internal leaders, are disrupted by state action. *See, e.g.*, *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357-58 (1997); *Eu v. S.F. County Democratic Cent. Comm.*, 489 U.S. 214, 230 (1989).

Because there is some burden on the plaintiffs' associational rights, we must apply the framework articulated in *Burdick*. *See* 504 U.S. at 433-34. In *Burdick*, the Supreme Court established a balancing test for courts to utilize when faced with a First Amendment challenge to a state election law:

> A court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights.

10

504 U.S. at 434 (internal quotation marks omitted) (quoting *Anderson*, 460 U.S. at 789, and *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 213-14 (1986)).

More recently, in *Clingman v. Beaver*, 544 U.S. 581 (2005), the Supreme Court employed the same weighing analysis it had applied in *Burdick*, even though the Court concluded that the burden on any associational interests was "minor." 544 U.S. at 587; *cf. id.* at 598-99 (O'Connor, *J.*, concurring in part and concurring in the judgment) (suggesting that the burden at issue was "modest" rather than minor). The Court found that the State had proffered three important interests served by its restriction, and the Court concluded that these three interests were together sufficient to justify the minor burden at issue. *See id.* at 587, 593-97 (majority opinion).

The defendants assert that pure rational basis review should be utilized in this case in reviewing the constitutionality of Election Law § 7-122. They are incorrect. Under *Burdick*'s "flexible standard," 504 U.S. at 434, the court must actually "weigh" the burdens imposed on the plaintiff against "the precise interests put forward by the State," and the court must take "into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* (quoting *Anderson*, 460 U.S. at 789). By contrast, under rational basis review, the plaintiff must "negative every conceivable basis which might support" the challenged law, *F.C.C.*, 508 U.S. at 315 (quoting *Lehnhausen v. Lake Shore Auto Parts*, 410 U.S. 356, 364 (1973)) (internal quotation marks omitted), even if some of those bases have absolutely no foundation in the record, *Heller*, 509 U.S. at 320-21.

The standards for review are clear. If the plaintiffs' rights are severely burdened, the statute is subject to strict scrutiny. *Burdick*, 504 U.S. at 435. If the burden is minor, but non-trivial,

11

*Burdick*'s balancing test is applied. Under this balancing test, the State's reasonable and nondiscriminatory restrictions will generally be sufficient to uphold the statute if they serve important state interests. *Id.* Review in such circumstances will be quite deferential, and we will not require "elaborate, empirical verification of the weightiness of the State's asserted justifications." *Timmons*, 520 U.S. at 364. Nonetheless, in cases like this one where the burden imposed by the law is non-trivial, we must weigh the State's justification against the burden imposed. *See Burdick*, 504 U.S. at 439; *see also Timmons*, 520 U.S. at 364.[9]

B.      *Identifying the Burden*

As the case comes to us, the record contains relatively little evidence about the extent of the burden on the plaintiffs' rights. There is undisputed evidence that McMahon and Thornton both submitted valid applications to vote by absentee ballot. However, the record does not reveal the exact reason why they were unable to vote in person. McMahon and Thornton might not have been able to vote in person for a very compelling reason, such as they were confined to a hospital bed. *See* N.Y. Elec. Law § 8-400(1)(c). It cannot be disputed that Election Law § 7-122 would impose a substantial burden on voters physically unable to attend a polling station because they are hospitalized, homebound, or incarcerated. Alternatively, McMahon and Thornton might not have been able to vote in person for a somewhat less compelling reason, such as they were be out-of-town on vacation. *See id.* § 8-400(1)(b).

_____

[9] The Supreme Court's opinion in *McDonald* does not alter our analysis. In *McDonald*, which was decided before *Burdick*, the Court applied rational basis review after observing that "there is nothing in the record to indicate that the [challenged] statutory scheme has an impact on appellants' ability to exercise the fundamental right to vote." 394 U.S. at 807. As will be discussed in the next section, the record in this case is not similarly barren.

12

For our initial purposes, it is important only that there is at least some burden on the voter-plaintiffs' rights. Indeed, whatever McMahon and Thornton's reasons for finding it difficult to vote in person, we note that the State of New York recognizes these reasons as sufficiently strong that it would always permit them to vote by absentee ballot in any other election.[10] Accordingly, we hold that the burden on the plaintiffs' rights is, at a minimum, not trivial.

C.      *Weighing the State's Justifications*

There are many plausible reasons why a state might choose not to provide absentee ballots in an election. For example, a state might reasonably be concerned about ballot security. *Cf., e.g.*, *In re The Protest of Election Returns and Absentee Ballots in the Nov. 4, 1997 Election for the City of Miami, Fla.*, 707 So. 2d 1170, 1174 (Fla. Dist. Ct. App. 1998) (invalidating all absentee ballots cast in an election tainted by "massive absentee balloting fraud"). Alternatively, a state might want to make sure that all voters cast their ballots on the same day, thereby ensuring that some voters have not cast their ballots before they learn about news that breaks late in a campaign. A state might also be concerned about the administrative expenses associated with absentee balloting.

In this case, however, the State has put forward no substantive justifications for the restrictions imposed by Election Law § 7-122. Instead, the State relies exclusively on its contrived

---

[10] The dissent suggests that "the record on 'burden' in this case consisted of nothing more than the plaintiffs' allegation that they wanted absentee ballots." Slip Op. at 5-6. However, the undisputed record shows that McMahon and Thornton submitted an application to vote by absentee ballot in the September 12, 2006, Republican primary election. That application was accepted, and so McMahon and Thornton were sent an absentee ballot which listed every race except the county committee race. Accordingly, we know from the record that McMahon and Thornton were burdened by at least one of the circumstances that would normally entitle a voter in New York State to vote by absentee ballot.

13

argument that tabulating absentee ballots could cause a delay in finalizing election results, which could interfere with the ACRC's ability to nominate a candidate in situations where quick action was required.[11]  Specifically, if a local elected office became vacant in a general election year, and the vacancy came into existence after early July but less than seven days before the September primary, and the office was required to be filled at the next general election, the new county committee would then need to nominate the party's candidate for that office within seven days after the primary election.  Because absentee ballots can be received up until the seventh day after the primary election, the State allegedly fears that elections with absentee balloting will not be certified in time to allow the ACRC to make a timely nomination.

As an initial matter, the importance of the State's interest is undercut by the fact that the ACRC is willing to incur this risk in order to allow absentee balloting.  As the Supreme Court recognized in *Eu*, a state does not have a compelling interest in "sav[ing] a political party from pursuing self-destructive acts" because the state cannot "substitut[e] its judgment for that of the party."  489 U.S. at 227-28.

Moreover, if absentee balloting is allowed, it is still extraordinarily unlikely that the ACRC would be unable to fulfill its nominating duties.  This is somewhat true as a general matter, because

_____

[11] Our dissenting colleague reads the State's brief to also make the related argument that election finality is important because the new committee members need to quickly perform such tasks as working on the party platform, engaging in voter outreach, and preparing endorsements. We do not read the State's brief to have articulated this argument. See Appellee's Br. at 11-16. Indeed, the State's brief actually appears to concede that administrative tasks like these can be performed even before an election winner is certified. See id. at 12 (acknowledging that, after the date of the primary election, outgoing committee members can still perform administrative functions on behalf of the ACRC).

vacancies are somewhat unusual events, and it is even less common for a vacancy to occur in the narrow window between early July and early September. And this is particularly true with regard to the ACRC, for several reasons.

First, elections for the ACRC only take place in *even* numbered years. That is important in this case, because the undisputed record showed that local offices in New York are generally voted upon in *odd* numbered years, making it "extremely unusual" for there to be a situation in which the ACRC would have to nominate a candidate in the same year that ACRC members were up for election. Kermani Decl. at ¶¶ 19-20. *Cf. Settineri*, 605 N.Y.S.2d at 96-97 (Balleta, *J.*, dissenting) (explaining that after the King County Republican Committee decided to elect its members in *odd* numbered years, the committee encountered a situation in which it had to fill a vacancy in a local office at the same time that the committee members were up for election).[12]

Second, there is no dispute that the overwhelming majority of elections for the ACRC are uncontested, with only about 1% of EDs featuring contested races in a typical election cycle. Candidates in the other 99% of EDs are automatically deemed elected as of the date of the primary. N.Y. Elec. Law § 6-160; *see also Hooper v. Power*, 233 N.Y.S.2d 392, 394 (N.Y. App. Div. 1962). Thus, even if a few ACRC races will be unsettled for several days while the candidates await certification, the overwhelming majority of ACRC members will be ready to act immediately after the date of the primary. Indeed, it is extraordinarily likely that, from these uncontested races, the ACRC will have far more members than it needs to make an immediate nomination: the ACRC can

---

[12] The plaintiffs concede, however, that it is possible for circumstances to arise in which a local office could be on the general election ballot in an even numbered year.

be "legally constituted" even if only 25 percent of its members have been elected. *See* N.Y. Election Law § 2-104(3).

Third, even if the ACRC inexplicably found itself unable to muster enough members to act when needed, the committee would still have at least one remedy available. In that unlikely scenario, state law would permit the outgoing committee chairman to make the needed nomination, so long as such action was consistent with the Republican party's internal rules. *See Settineri*, 624 N.E.2d at 683 (N.Y. 1993), *adopting the analysis stated in* 605 N.Y.S.2d at 96-98 (Balletta, *J.*, dissenting). We also note that the election code contemplates the possibility that a vacancy will occur "too late" to comply with the State's strict time limits for nominations. N.Y. Elec. Law § 6-158(13). In such scenarios the law directs nominating authorities like the ACRC to make their nominations "as soon as practicable." *Id.*

Finally, the State's flimsy proffered justification is further undermined by the fact that even the current system fails to ensure that election results are certified before the end of the seven day nominating period. Under Election Law § 9-200, the local boards of election have up to *nine* days to complete their canvass and certify the results. While the local boards *could* choose to certify election results within seven days, there is no guarantee that they will do so.[13] *Cf. Settineri*, 605

---

[13] Indeed, it actually appears that in some elections the board *must* wait seven days before it can certify the results in county committee races. In some election years, a county's primary election will coincide with elections for delegates to judicial nominating conventions. When this occurs, it appears that the board must certify the results from these delegate races before it may certify the results in any other election. *See* N.Y. Elec. Law § 9-200. Interestingly, New York permits voters to cast absentee ballots in these delegate races, *see id.* § 7-122, which means that these races sometimes cannot be certified until seven days have passed since the election–even though this delay may hold up the certifications in county committee elections.

N.Y.S.2d at 97 (Balleta, *J.*, dissenting) (describing how the local elections board waited eight days to certify the results of that year's county committee races, even though there was a vacancy that required the new committee to act within seven days of the primary).

Taking into account all of the above, we conclude that the State has burdened the plaintiffs' rights for a reason that is exceptionally and extraordinarily weak. While the burden on the plaintiffs' rights is not large, and while our review is accordingly deferential, we nonetheless conclude that the state's proffered reasons have such infinitesimal weight that they do not justify the burdens imposed. We therefore hold that, on this record, it is unconstitutional for the State to deny absentee ballots in ACRC elections.

## IV.

The fact pattern here is unusual, and our holding in this case is necessarily narrow. We do not hold that there is a general constitutional right to obtain absentee ballots. Nor do we hold that there is a constitutional right to obtain absentee ballots in all county committee races in New York State. Instead, after applying a deferential standard of review, and after examining the record in this as-applied challenge, we conclude that the arguments proffered by the State are so extraordinarily weak that they cannot justify the burdens imposed by Election Law § 7-122. The district court therefore erred in granting the defendants' Motion to Dismiss, and it erred in denying the plaintiffs' Motion for Summary Judgment.

The judgment of the district court is REVERSED and the case is REMANDED. The district court is instructed to enter judgment for the plaintiffs on those of their claims for which they moved for summary judgment.[14]

---

[14] On our review of the record, the plaintiffs did not move for summary judgment with regard to their request for nominal damages. If plaintiffs still wish to pursue nominal damages, they may seek to do so on remand.

17

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term 2007

Docket No. 07-5367-cv

DEBRA A. LIVINGSTON, *Circuit Judge*, dissenting:

The parties disagree in this case about the applicable standard of review, with the State relying on *McDonald v. Board of Election Commissioners*, 394 U.S. 802 (1969), to argue that rational basis scrutiny applies to all claims involving absentee balloting and the plaintiffs asking us to apply sliding scale scrutiny based on *Burdick v. Takushi*, 504 U.S. 428 (1992). Because I conclude that the law at issue here should be upheld under either test, I do not find it necessary to decide this issue and will assume without deciding that the potentially stricter *Burdick* balancing test governs our review of the plaintiffs' claims. Under this standard, we weigh the character and magnitude of the alleged injury to the plaintiffs' First and Fourteenth Amendment rights against the interests the State asserts to justify the burden imposed by its rule, keeping in mind that in our constitutional scheme, "States retain the power to regulate

their own elections," and that to do so, they must elaborate rules that "inevitably affect[] – at least to some degree – the individual's right to vote and his right to associate with others for political ends." *Id.* at 433 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)) (internal quotation marks omitted).

The plaintiffs allege that the State of New York has burdened their First Amendment associational rights by omitting to make absentee ballots available for party committeemen elections in Albany County. Since the State does not provide absentee ballots, voters who wish to vote in party committeemen elections must appear in person at the polls on Election Day. The record contains no information about the magnitude of the burden on these individual plaintiffs or the burden on voters generally, except for an affidavit by the Albany County Republican Committee chairman stating that "the Republican Party wants every possible Republican to participate in the election" and that "[t]he Republican Party desires that its members be allowed to vote by absentee ballot in such elections." (Kermani Decl. ¶¶ 16-17, *in* J.A. at 41.) The complaint contains similar allegations and also alleges that two individual plaintiffs "want[ed] to vote by absentee ballot for the Republican primary" and in fact "applied for the absentee ballot mainly because of their interest in voting for committeeman." (Compl.¶¶ 23-24, *in* J.A. at 15.)

Plaintiffs neither alleged in the complaint nor came forward with

19

evidence to show that the lack of absentee ballots for party committeemen elections in Albany County made voting impossible or even difficult for any voter. Given this procedural posture, we can assume only that two voters wanted to vote absentee for some reason and were not permitted to do so. The evidence suggests that contested committeemen elections are extremely rare. For all one can discern from the sparse record, these plaintiffs might be the *only* voters anywhere in Albany County who have ever attempted to vote absentee in a committee election; we simply do not have any information indicating the frequency with which absentee voting is sought. Moreover, nothing in the record indicates that it is difficult for voters generally to appear in person at the polls, nor that these particular plaintiffs would have suffered any burden more severe than a minor scheduling inconvenience had they simply remained within their precinct on election day and voted in person. On this record, if the plaintiffs have established any burden at all to their associational rights, it is no more than a peppercorn.[1] And the Supreme Court has noted that if the burden is small and

---

[1] The majority argues that the two voters demonstrated a burden by showing that the Board of Elections approved their request for absentee ballots, thus evidencing that they "were burdened by at least one of the circumstances that would normally entitle a voter in New York State to vote by absentee ballot." **Slip op. at 13 n.10.** Under New York law, however, a voter can qualify to vote absentee simply by going on vacation on election day in another county. N.Y. Elec. Law § 8-400(1)(b). A voter could thus spend the entire day a leisurely five-minute walk from his assigned voting location and still qualify for an absentee ballot, if it so happened that the voter was across the county border. Given plaintiffs' failure to introduce *any* evidence explaining why they needed an absentee ballot, we can infer

nondiscriminatory — as even the majority seems to concede — "the State's important regulatory interests are generally sufficient to justify the restrictions." *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788) (internal quotation marks omitted).

In assessing the State's countervailing regulatory interest, the majority focuses on the State's argument that allowing absentee voting might make it impossible for the political party promptly to fill vacancies that arise in the general election ticket shortly before the primary. The majority thinks such vacancies are unlikely. But the majority's view that this problem will rarely occur does not mean the State's interest in addressing it is entitled only to "infinitesimal weight," *cf.* **slip op. at 17** — particularly where the majority's conclusions about the likelihood of unfilled vacancies are largely inferential and have been reached without record evidence indicating how frequently vacancies in fact occur. It is not inconceivable that in some election years, interest in the party elections will be unusually high, resulting in many contested committee races and a need promptly to fill vacancies.

The majority argues that the State has no legitimate interest in having committeemen fill the vacancies because "the ACRC is willing to incur [the risk that committeemen cannot fill vacancies] in order to allow absentee

no burden more severe than this.

21

balloting." **Slip op. at 14** (citing *Eu v. San Francisco County Democratic Cent. Comm.*, 489 U.S. 214 (1989)). But the Supreme Court has held that States have a legitimate interest in ensuring that *each* party's candidates are selected democratically. *See Cal. Democratic Party v. Jones*, 530 U.S. 567, 572 (2000) ("[A] State may require parties to use the primary format for selecting their nominees, in order to assure that intraparty competition is resolved in a democratic fashion."); *Am. Party of Tex. v. White*, 415 U.S. 767, 781 (1974). And if the committeemen races are not all resolved promptly, either some election districts will be unrepresented when new candidates are chosen or the outgoing party chairman will make appointments. Either approach would be less democratic and participatory than having freshly elected committeemen from every election district take part in choosing candidates to fill vacant spots. The fact that party *leaders* are willing to let the party chairman fill vacancies in no way diminishes the State's interest in ensuring that party candidates are chosen by elected representatives of the *voters*.

Moreover, the vacancies problem is not the only governmental interest implicated by absentee voting here. The State's brief, fairly read, articulates a broader interest in finality and expeditiously convening the new party committees. The committee election involved in this case was held on September 12, 2006. I take judicial notice of the fact that the general election in

22

2006 was held just eight weeks later. During this short interval, the committees must hold organizational meetings and prepare the party for the general election, which might include work on the party platform, endorsements, or voter outreach. *See* N.Y. Elec. Law § 2-112. *See generally* N.Y. Elec. Law §§ 2-100 to -126. Absentee voting in these elections likely would delay certification of newly elected committeemen in contested races for at least a week during this important pre-election period. *See* N.Y. Elec. Law § 8-412 (requiring that absentee votes received in the seven days following the election be cast and counted). Without absentee voting, certification can take place much sooner. The State interest in ensuring that parties are operated by committeemen recently approved by the party's voters during this period is surely sufficient to outweigh whatever small burden the plaintiffs have made out.

Although the majority insists that its holding is "necessarily narrow" and does not require that absentee ballots be made available in all elections, **slip op. at 17**, I have some doubts. The record on "burden" in this case consisted of nothing more than the plaintiffs' allegation that they wanted absentee ballots; it is hard to imagine any future case that will have a *less* compelling record on burden. The majority's analysis at least suggests that the federal Constitution requires absentee ballots if the State's only reasons for denying them are finality and establishing a more participatory and democratic method of filling vacancies

23

in the party slate. This approach ignores both the State's interest in making legitimate policy judgments about the benefits and potential drawbacks of absentee voting in particular contexts, and the lack of judicial competence sensitively to balance the competing interests. It exceeds the appropriate scope of our review under *Burdick* and under *McDonald*.

I respectfully dissent.