09-0331-cv
Molinari v. Bloomberg

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

_____

August Term, 2008

(Argued: March 27, 2009   Last Suppl. Briefs Filed: April 10, 2009   Decided: April 28, 2009)

Docket No. 09-0331-cv

_____

GUY MOLINARI,

*Plaintiff,*

WILLAM C. THOMPSON JR., INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS THE NEW YORK CITY COMPTROLLER, BETSY GOTBAUM, INDIVIDUALLY AND IN HER OFFICIAL CAPACITY AS PUBLIC ADVOCATE FOR THE CITY OF NEW YORK, BILL DE BLASIO, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE NEW YORK CITY COUNCIL, LETITIA JAMES, INDIVIDUALLY AND IN HER OFFICIAL CAPACITY AS A MEMBER OF THE NEW YORK CITY COUNCIL, CHARLES BARRON, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE NEW YORK CITY CITY COUNCIL, ROSALIE CALIENDO, PHILLIP DEPAOLO, PHILIP FOGLIA, KENT LEBSOCK, ANDREA RICH, MIKE LONG, TOM LONG, SARAH LYONS, IDA SANOFF, GLORIA SMITH, ERIC SNYDER, KENNETH J. BAER, KENNETH A. DIAMONDSTONE, PETER GLEASON, MARK WINSTON GRIFFITH, ARI HOFFNUNG, ALFONSO QUIROZ, YDANIS RODRIGUEZ, JO ANNE SIMON, NEW YORK PUBLIC INTEREST RESEARCH GROUP, INC., U.S. TERM LIMITS, LUVENIA SUBER, STANLEY KALATHARA, AND RESPONSIBLE NEW YORK,

*Plaintiffs-Appellants,*

v.

MICHAEL R. BLOOMBERG, IN HIS OFFICIAL CAPACITY AS MAYOR OF THE CITY OF NEW YORK, CHRISTINE QUINN, IN HER OFFICIAL CAPACITY AS SPEAKER OF THE NEW YORK CITY COUNCIL, NEW YORK CITY COUNCIL, CITY OF NEW YORK,

*Defendants-Appellees,*

JAMES J. SAMPEL, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF COMMISSIONERS OF ELECTIONS FOR THE BOARD OF ELECTIONS IN THE CITY OF NEW YORK, AND BOARD OF ELECTIONS IN THE CITY OF NEW YORK,

*Defendants.*

————————

B e f o r e :

STRAUB, POOLER, RAGGI, *Circuit Judges.*

————————

On appeal from a judgment of the United States District Court for the Eastern District of New York (Charles P. Sifton, *Judge*), granting defendants' motion for summary judgment and dismissing plaintiffs' Amended Complaint. In October 2008, the New York City Council enacted Local Law 51, which Mayor Bloomberg signed into law on November 3, 2008. Local Law 51 amended previously existing term limits legislation by extending the number of eligible terms from two consecutive terms to three for the Mayor, Council Members, Public Advocate, Comptroller and Borough Presidents. Local Law 51 amends term limits legislation that was enacted in 1993 by referendum, and will allow certain officials to run for third terms in November 2009. Because we hold that Local Law 51 does not violate plaintiffs' First Amendment rights, substantive due process rights, New York State referendum law and the City of New York's conflict of interest law, we affirm.

————————

RANDY M. MASTRO, Gibson, Dunn & Crutcher LLP, New York, NY (Norman Siegel, New York, NY, on the brief), *for Plaintiffs-Appellants Willam C. Thompson Jr., Betsy Gotbaum, Bill de Blasio, Letitia James, Charles Barron, Rosalie Caliendo, Phillip DePaolo, Philip Foglia, Kent Lebsock, Andrea Rich, Mike Long, Tom Long, Sarah Lyons, Ida Sanoff, Gloria Smith, Eric Snyder, Kenneth J. Baer, Kenneth A. Diamondstone, Peter Gleason, Mark Winston Griffith, Ari Hoffnung, Alfonso Quiroz, Ydanis Rodriguez, Jo Anne Simon, U.S. Term Limits, Luvenia Suber, Stanley Kalathara, and Responsible New York.*

(Pieter Van Tol, Andrew Behrman, Lovells LLP, New York, NY, for *Plaintiff-Appellant New York Public Interest Research Group, Inc.*)

ALAN G. KRAMS, Assistant Corporation Counsel (Michael A. Cardozo, Corporation Counsel of the City of New York, *on the brief*), New York, NY, *for Defendants-Appellees.*

Harry Kresky, New York, NY, *for Lenora B. Fulani and the New York City Organizations of the*

*New York Independence Party as* amici curiae *in support of Plaintiffs-Appellants*.

Robert D. Joffe, Cravath, Swaine & Moore LLP, New York, NY, *for the Partnership for New York City, Inc. as* amicus curiae *in support of Defendants-Appellees*.

_____

STRAUB, *Circuit Judge*:

Plaintiffs-Appellants appeal from the judgment of the United States District Court for the Eastern District of New York (Charles P. Sifton, *Judge*), granting defendants' motion for summary judgment and dismissing plaintiffs' Amended Complaint. At issue in this litigation is an amendment to the Charter of the City of New York, entitled Local Law 51, which was passed by the City Council and signed into law by Mayor Michael R. Bloomberg on November 3, 2008. It provides that Members of the City Council, the Mayor, Public Advocate, Comptroller and Borough Presidents are eligible to serve a maximum of three consecutive terms in office. It amends sections 1337 and 1338 of the City Charter, which previously provided for a maximum of two consecutive terms for these officials and which were enacted by a city-wide referendum in 1993.

The individual plaintiffs include the current Comptroller and Public Advocate of New York City, several current members of the New York City Council who voted against the legislation at issue in this case, several individuals who are alleged to "have developed concrete plans" to run for City Council seats in the November 2009 election, several individuals who are alleged to have expended time and money in favor of the two public referenda on term limits which are also at issue in this case, and "voters from all walks of life – and all five boroughs of this great City – who . . . voted to impose term limits" in these two referenda. The plaintiffs also include three organizations – New York Public Interest Research Group, Inc., U.S. Term Limits

and Responsible New York – which were referred to by the District Court as "good-government groups."

The individual defendants are the current Mayor of New York City, the Speaker of the City Council and the current head of the New York City Board of Elections. The institutional defendants are the New York City Council, the Board of Elections and the City of New York itself.

The gravamen of plaintiffs' Amended Complaint is that defendants violated federal, State and City law by amending existing term limit legislation enacted by referendum, thereby extending themselves the opportunity to run for an additional term in office. Plaintiffs assert several causes of action, including violations of the United States and New York State Constitutions, the New York Municipal Home Rule Law and the City Charter's conflict of interest provisions. The District Court dismissed plaintiffs' Amended Complaint in its entirety on summary judgment.

On appeal, appellants advance four principal arguments. First, they argue that defendants violated their First Amendment rights because City voters will now be less likely to participate in the referendum process, and thus engage in less First Amendment speech, if laws enacted by referenda can be amended by City Council legislation. Second, they argue that defendants violated their substantive due process rights guaranteed by the Fourteenth Amendment of the United States Constitution because the sole purpose of Local Law 51 is to extend defendants' own political careers by entrenching incumbents. Third, they argue that defendants violated New York Municipal Home Rule Law § 23(2)(b), which they contend requires a mandatory referendum to enact the provisions of Local Law 51. Finally, they argue that defendants violated

4

the City Charter's conflict of interest provisions by enacting legislation conferring upon themselves a political benefit.  Because we hold that the enactment of Local Law 51 did not run afoul of any of these provisions, we affirm the District Court's judgment.

**BACKGROUND**

**I.      New York State's Referendum Scheme**

As a general matter, this case touches upon the City Council's and Mayor's authority to enact local laws amending the City Charter.  Cities in the State of New York are given broad power to enact local laws, including those amending a city charter, as long as they "relat[e] to its property, affairs or government" and are "not inconsistent with the provisions of th[e] [state] constitution or any general law."  N.Y. CONST., ART. IX, § 2; *see also* N.Y. MUN. HOME RULE LAW § 10(1)(i)-(ii).  This includes local laws relating to "[t]he powers, duties, qualifications, number, mode of selection and removal, terms of office, compensation, hours of work, protection, welfare and safety of its officers and employees."  N.Y. MUN. HOME RULE LAW § 10(1)(ii).

A city may enact such laws by a majority vote of its legislative body and the approval of its mayor, and, in the case of a mayor's veto, the legislative body may override the mayor's veto with a two-thirds vote.  *See id.* §§ 20-21.[1]  Moreover, sections 36 and 37 of the New York Municipal Home Rule Law allow voters to enact such laws directly by means of a referendum. *See id.* at §§ 36, 37.  Such a referendum may be initiated directly by voters through a process

---

[1] There is one exception at issue here, which will be discussed in Part III of this Opinion, namely, New York Municipal Home Rule Law § 23, which sets forth certain types of local laws that are "subject to mandatory referendum," N.Y. MUN. HOME RULE LAW § 23, including those that "change[] the membership . . . of the legislative body," *see id.* § 23(2)(b).

commonly referred to as a voter initiative. *See id.* § 37. Generally, if qualified voters file with the City Clerk a petition containing a certain number of signatures requesting that a proposed local law amending the City Charter be put to referendum, the proposed local law will appear on the ballot at the next general election. *See id.* A referendum proposing a local law amending the City Charter may also be initiated by a charter commission. *See id.* § 36. A charter commission may be created by a voters' petition, the City Council or the Mayor. *See id.* § 36(2)-(4).

Notwithstanding these provisions, the New York Court of Appeals has made clear that "[d]irect legislation in cities must always rest on some constitutional or statutory grant of power. Government by representation is still the rule. Direct action by the people is the exception." *McCabe v. Voorhis*, 243 N.Y. 401, 413 (1926).

**II.     1993 Voter Initiative and 1996 Referendum**

In November 1993, City voters put a referendum on the ballot by voter initiative proposing term limits for certain elected City officials, which was ultimately adopted by a vote of more than 59%. It provided:

> CHAPTER 50
> TERM LIMITS
>
> § 1137. Public Policy. It is hereby declared to be the public policy of the city of New York to limit to not more than eight consecutive years the time elected officials can serve as mayor, public advocate, comptroller, borough president and council member so that elected representatives are "citizen representatives" who are responsive to the needs of the people and are not career politicians.
>
> § 1138. Term Limits. Notwithstanding any provision to the contrary contained in this charter, no person shall be eligible to be elected to or serve in the office of mayor, public advocate, comptroller, borough president or council member if that person

6

had previously held such office for two or more full consecutive terms (including in the case of council member at least one four-year term), unless one full term or more has elapsed since that person last held such office; provided, however, that in calculating the number of consecutive terms a person has served, only terms commencing on or after January 1, 1994 shall be counted.

N.Y. City Charter §§ 1137-38 (N.Y. Legal Publ'g Corp. 2001) (repealed Nov. 3, 2008)

(hereinafter, the "1993 Voter Initiative").

In 1996, the City Council put a referendum on the ballot seeking to increase the term limits applicable to Council Members from two to three consecutive terms ("1996 Referendum"). City voters rejected the 1996 Referendum by a margin of approximately 54% to 46%.

**III.    2008 Term Limits Amendment**

More than a decade later, on October 2, 2008, Mayor Bloomberg announced that he intended to work with the Speaker of the City Council, Christine C. Quinn, to introduce legislation to extend the City's term limits set forth in sections 1137 and 1138 of the City Charter from two consecutive terms to three and then seek re-election. The Mayor emphasized that the change in law would allow voters to elect experienced leadership in a time of unprecedented fiscal crisis. Thus, on October 7, 2008, City Council Members, at the Mayor's request, introduced bill No. 845-A, which, if signed into law, would amend sections 1137 and 1138 of the City Charter to change the term limits from no more than two consecutive terms to no more than three such terms.

Plaintiffs claim that the Mayor was aware of his intentions to ask the City Council to pass legislation extending term limits as early as 2007,[2] but delayed his announcement until October

---

[2] Plaintiffs point to a *New York Times* article, which reports that the Mayor's "unofficial emissaries" "began approaching" term-limits proponent and "[b]illionaire" Ronald Lauder two

2008 so that voters could not put the issue of term limits on the ballot through a voter initiative prior to the November 2009 election. Under section 37 of New York Municipal Home Rule Law, if qualified voters were to have filed a petition following the introduction of the bill in October 2008 putting the term limits issue to a referendum, it would appear on the November 2009 election ballot at the earliest. *See* N.Y. MUN. HOME RULE LAW § 37(6)-(7). Even if successful, such a voter initiative would not affect those made eligible for reelection in November 2009 as a result of the Mayor's proposed amendment.

In addition, plaintiffs emphasize the reported discussions between the Mayor and Ronald Lauder. Specifically, *The New York Times* reported that Mr. Lauder initially vowed to "vigorously oppose" the plan outlined by Mayor Bloomberg, but he "backed down" after the Mayor promised him a seat on a charter commission that the Mayor agreed to convene in 2010 to put the term limits issue back on the ballot for referendum. Michael Barbaro & Kareem Fahim, *Lauder Opposes Mayor on Permanent Change to Term Limits*, N.Y. TIMES, Oct. 6, 2008, at A21 (available at J.A. 353-54). Plaintiffs claim that this agreement is reflected in the following provision of the bill:

> This local law shall take effect immediately and shall apply to elections held on or after the date of its enactment, provided that this local law shall be deemed repealed upon the effective date of a lawful and valid proposal to amend the charter to set term limits at two, rather than three, full consecutive terms, as such terms were in

years ago "to persuade him not to fight a one-time extension of term limits." Sam Roberts & Eric Konigsberg, *Enigmatic Billionaire Is Drawn Back to the Term Limits Fray*, N.Y. TIMES, Oct. 9, 2008, at A1 (available at J.A. 281-83). They also cite a *New York Post* report indicating that the Mayor's staff conducted polling no later than the beginning of June 2008 to explore whether voters would support a change to the City's term limits, which showed "little sentiment" among voters for such a change. David Seifman, *Mike's Poll Sizing Up "3rd Term"*, N.Y. POST, June 4, 2008, at 11 (available at J.A. 790).

> force and effect prior to the enactment of this local law, where such proposal has been submitted for the approval of the qualified electors of the city and approved by a majority of such electors voting thereon.

*See* S.A. 67-68. Plaintiffs argue that "[t]his alteration of the Term-Limits Bill made clear that the Bill's true purpose was to afford a third term in office to currently term-limited City officials only; afterward, the voters would decide the term limits applicable to subsequent generations of City officials." *See* Brief for Plaintiffs-Appellants William C. Thompson, Jr., *et al.* ("Brief for Appellants") at 11. Plaintiffs invoke a *New York Times* blog post reporting that Mr. Lauder stated, "'I believe very strongly that the mayor should get the extra term and the City Council should get a third term. That is part of the deal. But I never spoke about the first-term council members.'"[3] Michael Barbaro, *Lauder Puts New Hurdle in Mayor's Path*, N.Y. TIMES CITY ROOM, Oct. 21, 2008, http://cityroom.blogs.nytimes.com/2008/10/21/lauder-puts-a-new-hurdle-in-mayors-path/ (available at J.A. 360-61).

When the bill was introduced into the City Council, Public Advocate Betsy Gotbaum and City Council Members Bill de Blasio and Letitia James, who are plaintiffs and appellants in this action, requested the City's Conflicts of Interest Board to issue an advisory opinion as to whether

---

[3] Plaintiffs make many allegations about the proposed apostasy of Ronald Lauder's support for Local Law 51 in light of his former support for term limits in New York City, which took the form of large cash contributions to the pro-term limits position in the 1993 and 1996 referenda. Mr. Lauder is said to have "struck a deal" with Mayor Bloomberg pursuant to which he changed his position in return for the Mayor's promise to name him to the city commission which would seek to place the term limits issue on the ballot in 2010. But we think it important to note that Mr. Lauder is a private citizen who is free to change his political positions as he wishes. There is no allegation that he performed any illegal act and he is not a party to this action.

9

Council Members would violate the City Charter's conflict of interest provisions by voting on the bill. The Board ruled that no violation would occur. It reasoned that the conflict of interest provisions prohibit Members from voting on proposed legislation that would confer a personal benefit, but that an extension of term limits was a public benefit relating to their roles as public officials.

Council Members de Blasio and James subsequently filed a petition in New York State Supreme Court, New York County (Jacqueline W. Silbermann, Justice), seeking a temporary restraining order enjoining Council Members from voting on the bill on the ground that it would violate the City Charter's conflict of interest provisions. The court denied the petition, holding that no irreparable harm would occur to petitioners because they could, *inter alia*, abstain from voting on the bill and that "granting the TRO would be an undue interference by one branch of government with another at this stage of the legislative process, and, thus, the matter is not now justiciable." *DeBlasio v. Conflicts of Interest Board of the City of New York*, No. 1141289/08 (N.Y. Sup. Ct. Oct. 22, 2008) (TRO Hearing).

On October 23, 2008, the City Council voted 29 to 22 to enact Local Law 51, amending the City's term limits law to three consecutive terms. Of the fifty-one sitting Members who voted on the Bill, thirty-five would have been prohibited from running for reelection under the term limits enacted in 1993. Of those thirty-five Members, twenty-three voted to enact Local Law 51.

Mayor Bloomberg signed the bill into law on November 3, 2008. Local Law 51 provides, in relevant part:

§ 1137. Public policy. It is hereby declared to be the

10

public policy of the city of New York to limit the time elected officials can serve as mayor, public advocate, comptroller, borough president and council member so that elected representatives are "citizen representatives" who are responsive to the needs of the people and are not career politicians. *It is further declared that this policy is most appropriately served by limiting the time such officials can serve to not more than three full consecutive terms.*

§ 1138. Term limits. Notwithstanding any provision to the contrary contained in this charter, no person shall be eligible to be elected to or serve in the office of mayor, public advocate, comptroller, borough president or council member if that person had previously held such office for three or more full consecutive terms, unless one full term or more has elapsed since that person last held such office; provided, however, that in calculating the number of consecutive terms a person has served, only terms commencing on or after January 1, 1994 shall be counted.

Local Law No. 51 (Nov. 3, 2008). Immediately prior to signing the bill, Mayor Bloomberg expressed his commitment to convene a charter commission in 2010 to put the term limits issue back on the ballot for referendum.

## IV. This Litigation

Plaintiffs commenced this action on November 10, 2008 and filed an Amended Complaint on November 17, 2008. Their Amended Complaint alleges that defendants violated: (1) plaintiffs' First Amendment rights by amending the 1993 Voter Initiative through City Council legislation, thereby discouraging voters from participating in the referendum process in the future; (2) plaintiffs' substantive due process rights guaranteed by the Fourteenth Amendment by passing legislation with the sole purpose of extending their own political careers and entrenching incumbents; (3) State and City law mandating a referendum to enact legislation regarding term limits; and (4) the City Charter's conflict of interest provisions by enacting legislation that enabled certain Members of the City Council and the Mayor to run for reelection

11

and retain positions of seniority, thus conferring personal benefits at public expense.[4]

On December 12, 2008, defendants moved to dismiss the Amended Complaint and the parties cross-moved for summary judgment. On January 5, 2009, the District Court heard oral argument. On January 13, 2009, the District Court denied plaintiffs' motion for summary judgment and granted summary judgment to defendants, entering judgment shortly thereafter. On January 22, 2009, appellants timely filed a notice of appeal from the District Court's Memorandum and Order.[5]

**DISCUSSION**

"We review an award of summary judgment *de novo*, and we will uphold the judgment only if the evidence, viewed in the light most favorable to the party against whom it is entered, demonstrates that there are no genuine issues of material fact and that the judgment was

---

[4] Plaintiffs also asserted claims under the provision of the New York State Constitution that is analogous to the First Amendment. The District Court held that these claims failed for the same reasons that plaintiffs' First Amendment claims were subject to summary judgment. Although appellants do not appear to have made a direct statement that they have abandoned their state constitutional claims on this appeal, we agree with the appellees that they have in fact done so. The argument will therefore be treated by this Court as having been waived.

[5] On January 16, 2009, the City filed its request for administrative pre-clearance pursuant to section 5 of the Voting Rights Act with the Department of Justice ("DOJ"). *See* 42 U.S.C. § 1973c; 28 C.F.R. § 51.1 *et seq.* On March 17, 2009, the DOJ issued its pre-clearance letter, stating that it "does not interpose any objection to the specified changes [in Local Law 51,]" but its failure to object "does not bar subsequent litigation to enjoin the enforcement of the changes." Because the District Court's judgment was entered prior to the DOJ's pre-clearance letter, it was without jurisdiction to do so. *See, e.g.*, *McDaniel v. Sanchez*, 452 U.S. 130, 153 (1981); *see also Branch v. Smith*, 538 U.S. 254, 283-84 (2003) (Kennedy, J., plurality concurring opinion) ("To be consistent with the statutory scheme, the district courts should not entertain constitutional challenges to nonprecleared voting changes and in this way anticipate a ruling not yet made by the Executive."). Accordingly, we remanded to the District Court on March 30, 2009 for it to affirm in full its prior judgment, which it did on April 7, 2009. The parties subsequently filed supplemental briefs on April 8, 2009, indicating that they reassert their identical pleadings and arguments previously filed in this appeal. This action is, therefore, ripe for our review.

12

warranted as a matter of law." *Barfield v. N.Y. City Health & Hosp. Corp.*, 537 F.3d 132, 140 (2d Cir. 2008) (citing Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Rubens v. Mason*, 527 F.3d 252, 254 (2d Cir. 2008)).

**I.       The First Amendment**

In their Amended Complaint, plaintiffs allege that defendants violated their First Amendment rights by enacting Local Law 51. They claim that they as well as other voters in the City will be less likely to participate in the referendum process in the future, and thus engage in less First Amendment speech, if laws enacted by referenda can be amended or repealed by City Council legislation. Applying the First Amendment balancing test first set forth in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), the District Court dismissed plaintiffs' claim. *See Molinari v. Bloomberg*, 596 F. Supp. 2d 546, 565-67 (E.D.N.Y. 2009). It held, "On balance, no rational fact finder could conclude that the claimed interference with plaintiffs' [First Amendment] rights outweighs the right of the City Council to let people choose the best candidates to deal with the current economic situation." *Id.* at 567.

Here, appellants claim that the District Court used the correct analytical framework but misapplied it. They emphasize that the record contains evidence showing that those who participated in the 1993 and 1996 referenda process have no intention of doing so in the future if the law ultimately enacted and maintained thereby can simply be amended by City Council legislation. In essence, they argue that Local Law 51 "decreases [their speech's] effectiveness" and, as a result, their speech is chilled. *See* Brief for Appellants at 22. They contend, moreover, that the "timing [of Local Law 51] exacerbated these already-significant burdens by directly frustrating the timely exercise of New York City voters' acknowledged right to put the term

13

limits issue to a third citywide vote prior to this November's election." *See id.* at 25. They allege that the sole purpose of Local Law 51 was to "entrench" incumbents and, as such, their First Amendment interests outweigh the interests of the City. *See id.* at 26-31. Appellees, for their part, claim that the objective of Local Law 51 was to provide the City's citizens the opportunity to vote for experienced public officials in a time of financial crisis. Appellants contend, however, that Local Law 51 was not necessary to achieve this objective because the Mayor or the City Council could have timely put the issue of term limits to a referendum prior to the November 2009 election.[6] *See generally* N.Y. MUN. HOME RULE LAW § 36.

We agree, however, with appellees' further argument that Local Law 51 does not implicate plaintiffs' First Amendment rights and, therefore, we need not decide whether the District Court erred in determining that the City's interests outweighed plaintiffs' First Amendment interests. No balancing is necessary because plaintiffs do not have a viable First Amendment claim in the first place.

A.      **Plaintiffs Have Not Identified a Burden on Their First Amendment Rights**

The logical starting point is to identify precisely what plaintiffs are claiming it is that violates their First Amendment right to free speech. There is no doubt that New York law permits the City Council to amend a law previously enacted by referendum, as the New York Court of Appeals has so held. *See Caruso v. City of N.Y.*, 517 N.Y.S.2d 897 (Sup. Ct. 1987) (Blyn, *J.*), *aff'd on op. of Blyn, J.*, 533 N.Y.S.2d 379 (App. Div. 1st Dep't 1988), *aff'd on op. of*

---

[6] The Mayor and the City Council each has authority to create a charter commission, which could theoretically put an issue on the ballot for referendum at a special election as early as sixty days after the proposed legislation is filed with the city clerk. *See* N.Y. MUN. HOME RULE LAW § 36(2), (4), (5)(b).

14

*Blyn, J.*, 547 N.E.2d 92 (N.Y. 1989), *cert. denied*, 493 U.S. 1077 (1990).  By adopting the lower court's opinion, the New York Court of Appeals stated:

> [T]he laws proposed and enacted by the people under an initiative provision are subject to the same constitutional, statutory and charter limitations as those passed by the Legislature and are entitled to no greater sanctity or dignity.  Inasmuch as a legislative body may modify or abolish its predecessor's acts subject only to its own discretion, it likewise should be able, in the absence of an express regulation or restriction, to amend or repeal an enactment by the electorate, its co-ordinate unit, and *vice versa*.

*Id.* at 900 (internal citations omitted).[7]

Although we are clearly bound to follow *Caruso* as a matter of New York State law, *see Van Buskirk v. N.Y. Times Co.*, 325 F.3d 87, 89 (2d Cir. 2003), plaintiffs, at bottom, contend that this scheme violates the First Amendment because it discourages citizens from participating in the referendum process.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of people peaceably to assemble, and to petition the Government for a redress of grievances."  U.S. CONST., amend I.  The Fourteenth Amendment makes that prohibition applicable to the State and City of New York.  *See Thornhill*

---

[7] Appellants appear to argue in a footnote that *Caruso* is distinguishable because it did not address "whether that power allows a wholly self-interested legislature to completely eviscerate a referendum that was explicitly intended to constrain that body's own power." *See* Brief for Appellants at 48-49 n.15.  This is simply a recast of plaintiffs' conflict of interest argument, which we address *infra*, Part IV.  Appellants also appear to argue that *Caruso* is inapposite because the term limits law enacted by the 1993 Voter Initiative expressly stated that it was the "public policy" of New York City not to permit an elected official to serve more than eight consecutive years.  We fail to see how *Caruso* is limited to those laws that do not affect the City's "public policy."  It is clear that that the New York Court of Appeals did not intend to limit the import of *Caruso* in this respect:  the issue presented was "whether the Council may amend or repeal a local law enacted by voter initiative." *See Caruso*, 517 N.Y.S.2d at 899.  This question was answered in the affirmative. *See id.* at 899-901.

15

*v. Alabama*, 310 U.S. 88, 95 (1940). It is axiomatic that "[t]he First Amendment 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Meyer v. Grant*, 486 U.S. 414, 421 (1988) (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)).

Although it is self-evident that the referendum can serve "[a]s a basic instrument of democratic government," *City of Eastlake v. Forest City Enters., Inc.*, 426 U.S. 668, 679 (1976), the right to pass legislation through a referendum is a state-created right not guaranteed by the U.S. Constitution, *see Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1210-11 (10th Cir.) ("[N]othing in the language of the Constitution commands direct democracy, and [the court is] aware of no [contrary] authority."), *cert. denied*, 537 U.S. 814 (2002). *See also Marijuana Policy Project v. United States*, 304 F.3d 82, 85 (D.C. Cir. 2002); *Stone v. City of Prescott*, 173 F.3d 1172, 1174-76 (9th Cir.), *cert. denied*, 528 U.S. 870 (1999); *Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291, 295 (6th Cir. 1993) ("[T]he Constitution does not require a state to create an initiative procedure."); *Pony Lake Sch. Dist. 30 v. State Comm. for Reorganization of Sch. Dists.*, 710 N.W.2d 609, 623 (Neb.) ("Because the rights of initiative or referendum are a means of direct democracy, federal courts have concluded that the partial reservation or total absence of the right of initiative or referendum in a state constitution does not violate a fundamental right to vote."), *cert. denied*, 547 U.S. 1130 (2006); *cf. Hunter v. Erickson*, 393 U.S. 385, 392 (1969) (implying the same); *Meyer*, 486 U.S. at 421-25 (same).

Nonetheless, as the Supreme Court has recognized, if a state chooses to confer the right of referendum to its citizens, it is "obligated to do so in a manner consistent with the Constitution." *Meyer*, 486 U.S. at 420; *Taxpayers United for Assessment Cuts*, 994 F.2d at 295 ("[W]e conclude

16

that although the Constitution does not require a state to create an initiative procedure, if it creates such a procedure, the state cannot place restrictions on its use that violate the federal Constitution."). Thus, courts have decided whether particular regulations of voter initiative or referendum schemes have run afoul of the U.S. Constitution. *See, e.g.*, *Cipriano v. City of Houma*, 395 U.S. 701 (1969) (holding unconstitutional under the Equal Protection Clause the restriction of the right to vote in a revenue bond referendum to only those who pay property taxes); *Wirzburger v. Galvin*, 412 F.3d 271 (1st Cir. 2005) (rejecting a Free Exercise challenge to provisions of the Massachusetts Constitution prohibiting voter initiatives to amend the state constitution to allow public financial support of private, religiously affiliated schools), *cert. denied*, 546 U.S. 1150 (2006).

The Supreme Court, in *Meyer v. Grant* and *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999), addressed the First Amendment restrictions on such governmental regulation of voter initiatives. In *Meyer*, the Supreme Court held that Colorado's prohibition against paying circulators of voter initiative petitions violated the First Amendment. *See* 486 U.S. at 415-16, 422-23. The Court made clear "that the power to ban initiatives entirely" does not allow a state "to limit discussion of political issues raised in initiative petitions." *Id.* at 425. The Court explained:

> The circulation of an initiative petition of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change. Although a petition circulator may not have to persuade potential signatories that a particular proposal should prevail to capture their signatures, he or she will at least have to persuade them that the matter is one deserving of the public scrutiny and debate that would attend its consideration by the whole electorate. This will in almost every case involve an explanation of the nature of the proposal and why

17

> its advocates support it. Thus, the circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as "core political speech."

*Id.* 421-22 (internal footnote omitted).

The Court went on to say that the refusal to permit the plaintiffs to pay petition circulators restricted protected speech in two ways:

> First, it limits the number of voices who will convey appellees' message and the hours they can speak and, therefore, limits the size of the audience they can reach. Second, it makes it less likely that appellees will garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion.

*Id.* at 422-23 (internal footnote omitted). The Court rejected "the State's arguments that the prohibition is justified by its interest in making sure that an initiative has sufficient grass roots support to be placed on the ballot, or by its interest in protecting the integrity of the initiative process."[8] *Id.* at 425. The Court concluded, therefore, that the State failed to justify the burden on political expression and held the law unconstitutional. *See id.* at 428.

In *Buckley*, the Supreme Court held unconstitutional under the First Amendment each of the following three conditions that Colorado placed on the ballot-initiative process: "(1) the requirement that initiative-petition circulators be registered voters; (2) the requirement that they wear an identification badge bearing the[ir] . . . name; and (3) the requirement that proponents of an initiative report the names and addresses of all paid circulators and the amount paid to each

---

[8] As to the former, the Court concluded that it was "adequately protected by the requirement that no initiative proposal may be placed on the ballot unless the required number of signatures has been obtained." *Meyer*, 486 U.S. at 425-26. As to the latter, the Court explored the various other "provisions of the Colorado statute" that "deal expressly with the potential danger that circulators might be tempted to pad their petitions with false signatures" and found them to be sufficient to achieve the State's objective. *Id.* at 427.

circulator." 525 U.S. at 186 (citations omitted). The Supreme Court concluded that all three of Colorado's requirements drastically reduced the number of persons, both volunteer and paid, available to circulate petitions. *Id.* at 193-205. It went on to conclude that the State's dominant justification – to police lawbreakers among petition circulators – was "served by the requirement . . . that each circulator submit an affidavit setting out, among several particulars, the 'address at which he or she resides, including the street name and number, the city or town, and the county.'" *Id.* at 196 (brackets omitted). It held, therefore, that the requirements were unconstitutional, as they "cut[] down the number of message carriers in the ballot-access arena without impelling cause." *Id.* at 197.

Both *Meyer* and *Buckley* "involved an unconstitutional regulation of speech that happened to occur in the context of an . . . initiative scheme." *Save Palisade FruitLands*, 279 F.3d at 1212. The challenged laws "specifically regulated the process of advocacy itself: the laws dictated *who* could speak (only volunteer circulators and registered voters) or *how* to go about speaking (with name badges and subsequent reports)." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1099 (10th Cir. 2006) (*en banc*), *cert. denied*, 549 U.S. 1245 (2007). Together, *Meyer* and *Buckley* make clear that the First Amendment protects political speech from undue government interference in the context of referendum petitioning.

However, *Meyer* and *Buckley* do not guarantee a right to legislate by referendum, much less a right protecting a law enacted by referendum from amendment or repeal by a legislative body. As explained by the Tenth Circuit *en banc*:

> Although the First Amendment protects political speech incident to an initiative campaign, it does not protect the right to make law, by initiative or otherwise. . . . The distinction is

> between laws that regulate or restrict the communicative conduct of persons advocating a position in a referendum, which warrant strict scrutiny, and laws that determine the process by which legislation is enacted, which do not.

*Id.* at 1099-1100 (citation omitted); *see also Biddulph v. Mortham*, 89 F.3d 1491, 1498 n.7 (11th Cir. 1996) (explaining that in *Meyer*, "the Court established an explicit distinction between a state's power to regulate the initiative process in general and the power to regulate the exchange of ideas about political changes sought through the process. The Court only addressed the constitutionality of the latter.").

Here, plaintiffs are not in any way restricted from engaging in First Amendment activity as the referenda proponents were in *Meyer* and *Buckley*. In fact, plaintiffs emphasize that they were free to exercise their First Amendment rights in connection with the 1993 and 1996 referenda in an attempt to highlight the time and cost they expended on those efforts. Plaintiffs remain free to do so in connection with referenda or otherwise now and in the future. Plaintiffs' claim is simply that their First Amendment rights are violated by Local Law 51 because City voters will be less likely in the future to engage in the referendum process if a law enacted by that process can be amended or repealed through City Council legislation.[9] This claim implicates no First Amendment right. *Cf. Smith v. Ark. State Highway Employees*, 441 U.S. 463, 464-65 (1979) (per curiam) ("The First Amendment right to associate and to advocate 'provides no guarantee that a speech will persuade or that advocacy will be effective.'") (quoting *Hanover Township Fed'n of Teachers v. Hanover Cmty. Sch. Corp.*, 457 F.2d 456, 461 (7th Cir. 1972));

---

[9] It would be remiss not to mention the fact that the 1993 Voter Initiative imposed the previous term limits on elected officials in New York City for over fifteen years – even withstanding the 1996 Referendum – thereby underscoring the significant effect that City voters have had on the electoral process.

20

*Ukrainian-Am. Bar Ass'n, Inc. v. Baker*, 893 F.2d 1374, 1379 (D.C. Cir. 1990) ("The right to speak protected by the first amendment is not, however, a right to be heeded."). At bottom, "there is a crucial difference between a law that has the 'inevitable effect' of reducing speech because it restricts or regulates speech, [as in *Meyer* and *Buckley,*] and a law that has the 'inevitable effect' of reducing speech because it makes particular speech less likely to succeed." *Initiative & Referendum Inst.*, 450 F.3d at 1100. The former implicates the First Amendment and the latter does not. *See generally id.*

We find instructive the Tenth Circuit's *en banc* decision in *Initiative & Referendum Inst.* It addressed whether an amendment to the Utah Constitution authorizing referenda violated the First Amendment by singling out initiatives regarding wildlife management by requiring a super-majority for their adoption. *See id.* at 1086. The plaintiffs, including six wildlife and animal advocacy groups, argued that by raising the bar for wildlife initiatives, this provision imposed a "chilling effect" on the exercise of their First Amendment rights because it made it more difficult to pass such initiatives. *See id.* The Tenth Circuit rejected their argument, writing:

> Under the Plaintiffs' theory, every structural feature of government that makes some political outcomes less likely than others – and thereby discourages some speakers from engaging in protected speech – violates the First Amendment. Constitutions and rules of procedure routinely make legislation, and thus advocacy, on certain subjects more difficult by requiring a supermajority vote to enact bills on certain subjects. . . . [citing examples] These provisions presumably have the "inevitable effect" of reducing the total "quantum of speech" by discouraging advocates of nuclear power plants, general banking laws, or unauthorized state flags from bothering to seek legislation or initiatives embodying their views. Yet if it violates the First Amendment to remove certain issues from the vicissitudes of ordinary democratic politics, constitutions themselves are unconstitutional. Indeed, the Plaintiffs' theory would have the

21

ironic effect of rendering the relief they seek in this litigation unconstitutional under the First Amendment: if it is unconstitutional to amend the Utah constitution to require a supermajority to approve a wildlife initiative, those who favor such an amendment would be less likely to engage in advocacy in its favor.

No doubt the Plaintiffs are sincere in their many sworn statements that they find the heightened threshold for wildlife initiatives dispiriting, and feel "marginalized" or "silenced" in the wake of Proposition 5. Their constitutional claim begins, however, from a basic misunderstanding.  The First Amendment ensures that all points of view may be heard; it does not ensure that all points of view are equally likely to prevail.

*Id.* at 1100-01 (internal citations omitted).

We believe that the Tenth Circuit's analysis is sound and equally applicable here.  That is, while the plaintiffs in *Initiative & Referendum Inst.* claimed that their First Amendment rights were chilled because Utah's super-majority requirement made it more difficult to pass wildlife referenda, plaintiffs here claim that their First Amendment rights are chilled because New York State law puts referenda and City Council legislation on equal footing, permitting the latter to supersede the former (and *vice versa*).  As such, like in *Initiative & Referendum Inst.*, there is no restriction on plaintiffs' speech.

Other courts have addressed analogous circumstances and come to similar conclusions that reinforce our holding that no First Amendment right is implicated in this case.  For example, *Pony Lake School District 30 v. State Committee for Reorganization of School Districts*, 710 N.W.2d 609, 624-25 (Neb.), *cert. denied*, 547 U.S. 1130 (2006), held that Nebraska's referendum process did not violate the First Amendment by requiring a heightened amount of petition signatures to temporarily suspend the operation of a law that was enacted by a legislative

22

body pending a referendum approving it. The court reasoned:

> Although plaintiffs primarily rely on *Meyer* and *Buckley* to support their position, neither case is applicable to initiative or referendum processes that do not restrict political communication or association. Neither do they apply to legislation which is not intended to regulate these procedures.
>
> [The act] does not impose any restrictions or conditions on plaintiffs' right to communicate with voters about the political change they seek. Nor does [the act] attempt to regulate the circulation of initiative or referendum petitions. Rather, plaintiffs' assertion that their right to free speech has been diminished is based entirely upon their claim that unless [the act] is suspended until the referendum vote, the ability of those opposed to [it] to persuade voters to reject it will be more difficult. Plaintiffs' claim is not based upon any actual restrictions on their right to communicate with voters.
>
> Given the conditions the people of Nebraska have imposed on their power to suspend an act's operation pending a referendum election, the "difficulty," as described by plaintiffs, can be avoided only by this court's expanding the scope of the referendum power itself. As discussed, the U.S. Constitution does not guarantee a right of referendum, and to expand this right would be to ignore the clear and unambiguous procedure set out by the people in article III, § 3, of the state Constitution. This we shall not do.

*Id.* (internal citations omitted); *see also Marijuana Policy Project v. United States*, 304 F.3d 82, 84, 85 (D.C. Cir. 2002) (rejecting a First Amendment challenge to a law denying the District of Columbia authority to "enact . . . any law" reducing penalties associated with possession, use, or distribution of marijuana, because the legislation "restricts no speech; to the contrary, medical marijuana advocates remain free to lobby, petition, or engage in other First Amendment-protected activities to reduce marijuana penalties."); *Stone v. City of Prescott*, 173 F.3d 1172, 1775 (9th Cir.) (holding that an Arizona ordinance denying its citizens the opportunity to petition for a city-wide referendum with respect to laws passed under an

23

emergency declaration did not fall within the orbit of *Meyer* and *Buckley*, as the law at issue was "not a restriction, condition, or requirement that impermissibly burdens the exercise of the referendum power, thereby invoking the protection of the First Amendment. Instead, it is a delegation to the legislature by the people of a part of their reserved power of referendum."), *cert. denied*, 528 U.S. 870 (1999); *Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291, 297 (6th Cir. 1993) ("Unlike the challenged provisions in *Meyer*, Michigan's initiative system does not restrict the means that the plaintiffs can use to advocate their proposal. . . . Our result would be different if, as in *Meyer*, the plaintiffs were challenging a restriction on their ability to communicate with other voters about proposed legislation, or if they alleged they were being treated differently than other groups seeking to initiate legislation."); *Wellwood v. Johnson*, 172 F.3d 1007, 1009 (8th Cir. 1999) (upholding an Arkansas law that required the signatures of 15 percent of the registered voters in a political subdivision to put on the ballot a local initiative regarding whether a county is "wet" or "dry" because the requirement "in no way burden[s] the ability of supporters of local-option elections to make their views heard").

As our Sister Circuits (and the Nebraska Supreme Court) have recognized, plaintiffs' First Amendment rights are not implicated by referendum schemes *per se* (and certainly not by the City Council's amendment of a law previously enacted by a referendum), but by the regulation of advocacy within the referenda process, *i.e.*, petition circulating, discourse and all other protected forms of advocacy. Even if plaintiffs are correct that the enactment of Local Law 51 will make it more difficult for plaintiffs to organize voter initiatives and referenda in the future, "the difficulty of the process alone is insufficient to implicate the First Amendment, as long as the communication of ideas associated with the [referendum process] is not affected."

24

*Dobrovolny v. Moore*, 126 F.3d 1111, 1113 (8th Cir. 1997), *cert. denied*, 523 U.S. 1005 (1998).

Here, no such effect exists. Nothing is preventing plaintiffs from engaging in First Amendment speech regarding term limits, whether within the referendum context or not. While we appreciate the practical reality that City voters will not be able to stop certain elected officials from seeking a third term in office through a voter initiative because the process would take until at least the November 2009 election, *see supra* **[pp. 7-8]**, this temporal fact does not amount to a First Amendment violation. *See, e.g.*, *Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1210-11 (10th Cir.) (holding that the United States Constitution does not guarantee the right to pass legislation by means of a referendum), *cert. denied*, 537 U.S. 814 (2002).

**B.** **Balancing Under *Anderson v. Celebrezze* is Unnecessary**

Appellants argue, however, that Local Law 51 is entitled to First Amendment scrutiny under *Anderson v. Celebrezze*, 460 U.S. 780 (1983). They state, because "[a]ll election laws invariably impose some burden upon individual voters," *Green Party of N.Y. State v. N.Y. State Bd. of Elections*, 389 F.3d 411, 419 (2d Cir. 2004) (internal quotation marks omitted), Local Law 51 is subject to First Amendment balancing. Their argument begins from a faulty premise. *Anderson* and its progeny deal with election and voting rights laws that restrict speech or ballot access. Local Law 51 does neither.

To clarify this point, it is necessary to briefly discuss *Anderson*, its progeny and the cases cited by appellants in their briefs. In *Anderson*, the Supreme Court addressed the First Amendment validity of Ohio's early filing deadline, which required an independent candidate for the President of the United States to file his or her paperwork by March 20 in order to be on the general election ballot for November 1980. *See* 460 U.S. at 782-83. As the Supreme Court

25

pointed out, by March of an election year, "developments in campaigns for the major-party nominations have only begun, and the major parties will not adopt their nominees and platforms for another five months." *Id.* at 790-91. The Supreme Court wrote:

> Constitutional challenges to specific provisions of a State's election laws . . . cannot be resolved by any "litmus-paper test" that will separate valid from invalid restrictions. Instead, a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Id.* at 789. The Supreme Court concluded that the early filing deadline had the effect of "totally exclud[ing] any candidate who makes the decision to run for President as an independent after the March deadline." *Id.* at 792. It reaffirmed that "it is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status." *Id.* at 793. The Court wrote:

> A burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment. It discriminates against those candidates and – of particular importance – against those voters whose political preferences lie outside the existing political parties. By limiting the opportunities of independent-minded voters to associate in the electoral arena to enhance their political effectiveness as a group, such restrictions threaten to reduce diversity and competition in the marketplace of

26

ideas. Historically political figures outside the two major parties have been fertile sources of new ideas and new programs; many of their challenges to the status quo have in time made their way into the political mainstream. In short, the primary values protected by the First Amendment – "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open"– are served when election campaigns are not monopolized by the existing political parties. . . . The Ohio filing deadline challenged in this case does more than burden the associational rights of independent voters and candidates. It places a significant state-imposed restriction on a nationwide electoral process.

*Id.* at 794-95 (internal citations and footnote omitted). The Court proceeded to hold the statute unconstitutional, concluding that these burdens outweighed the State's minimal interests in imposing a March deadline. *See id.* at 796-806.

We recently had occasion to apply the *Anderson* balancing test in *Price v. New York State Board of Elections*, 540 F.3d 101 (2d Cir. 2008), upon which appellants rely heavily in their brief. In *Price*, we addressed the First Amendment constitutionality of New York's prohibition on voting by absentee ballot in elections for political party county committees. *See id.* at 103-04. We reiterated the Supreme Court's statement that "[a]ll '[e]lection laws will invariably impose some burden upon individual voters.'" *Id.* at 107 (quoting *Burdick v. Takushi*, 504 U.S. 428, 433 (1992)) (second alteration in original). We emphasized that, in determining whether to apply the First Amendment balancing test, "it is important only that there is at least some burden on the voter-plaintiffs' rights." *Id.* at 109. We held that the plaintiffs "have an associational right to vote in political party elections, and that right is burdened when the state makes it more difficult for these voters to cast ballots." *Id.* at 108 (internal citations omitted). In addition, we held that "candidates' associational rights are affected, in at least some manner, when barriers are placed

27

before the voters that would elect these candidates to party positions." *Id.* (citing *Anderson*, 460 U.S. at 786). We concluded: "Because there is some burden on the plaintiffs' associational rights, we must apply the framework articulated in *Burdick*." *Id.* (citing *Burdick*, 504 U.S. at 433-34). On balance, we concluded that the State's interests were of "infinitesimal weight" and thus could not outweigh the plaintiff's First Amendment interests. *See id.* at 110-12.

In an attempt to convince us to apply the *Anderson* balancing test to Local Law 51, appellants seize on our recent reaffirmation that "[a]ll election laws will invariably impose some burden upon individual voters." *Price*, 540 F.3d at 107 (quoting *Burdick*, 504 U.S. at 433) (internal quotation marks and alteration omitted). But *Anderson*, *Burdick* and their progeny (as well as all the other cases cited by appellants) are completely inapposite.[10] These cases all

_____

[10] *See, e.g.*, *Crawford v. Marion County Election Bd.*, 128 S. Ct. 1610 (2008) (applying *Anderson*'s balancing test and upholding a Voter ID law); *Randall v. Sorrell*, 548 U.S. 230 (2006) (plurality opinion) (striking down, in the face of a First Amendment challenge, Vermont's campaign finance statute limiting both the amounts that candidates for state office could spend on their campaigns and the amounts that individuals, organizations, and political parties could contribute to those campaigns); *Clingman v. Beaver*, 544 U.S. 581 (2005) (applying *Anderson*'s balancing test and rejecting the Libertarian Party's challenge to Oklahoma's semi-closed primary allowing a party to invite its own members and those registered as Independents to vote in the party's primary, but not members of other parties); *Burdick*, 504 U.S. 428 (applying *Anderson*'s balancing test and upholding Hawaii's ban on write-in voting); *Rutan v. Republican Party of Ill.*, 497 U.S. 62 (1990) (holding that the First Amendment prohibits government officials from discharging or threatening to discharge public employees solely for not supporting the political party in power); *Eu v. San Francisco County Democratic Cent. Comm.*, 489 U.S. 214 (1989) (holding that California violated the First Amendment by, *inter alia*, banning primary endorsements by political parties); *Bullock v. Carter*, 405 U.S. 134 (1972) (upholding an Equal Protection challenge to a Texas law requiring a candidate to pay a filing fee as a condition to having his name placed on the ballot in a primary election); *Williams v. Rhodes*, 393 U.S. 23, 24 (1968) (invalidating Ohio's election laws that made "it virtually impossible for a new political party, even though it has hundreds of thousands of members, or an old party, which has a very small number of members, to be placed on the state ballot to choose electors pledged to particular candidates for the Presidency and Vice Presidency of the United States"); *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579 (6th Cir. 2006) (invalidating an Ohio election law requiring all minor parties to file a petition no later than 120 days prior to the date of the primary

28

involve direct restrictions on speech or access to the ballot. Plaintiffs face no such restrictions by virtue of Local Law 51. Rather, plaintiffs argue that they and other voters will be less likely to engage in speech and that their speech will potentially become less effective if law passed by referenda can be amended or repealed by City Council legislation. For the reasons explained, this does not amount to a First Amendment violation.

Finally, in footnote five of their Brief and throughout their Reply Brief, appellants argue that their First Amendment rights are violated because the extension of term limits "burdens both voters in their ability to effectively support would-be challengers to entrenched incumbents and challengers in their ability to mount effective campaigns." Brief for Appellants at 24 n.5. Thus, in order to trigger First Amendment scrutiny, appellants argue that Local Law 51 affects the "eligibility of candidates." Reply Brief for Plaintiffs-Appellants William C. Thompson, Jr., *et al.* ("Reply Brief for Appellants") at 5 (citing *Anderson*, 460 U.S. at 788 ("Each provision of these schemes, whether it governs the registration and qualifications of voters, the selection and *eligibility of candidates*, or the voting process itself, inevitably affects – at least to some degree – the individual's right to vote and his right to associate with others for political ends.") (emphasis added)).

Notwithstanding appellants' protestations to the contrary, this argument necessarily focuses on the substantive impact that the extension of term limits has on the political landscape.

election); *Green Party of N.Y. State v. N.Y. State Bd. of Elections*, 389 F.3d 411 (2d Cir. 2004) (applying the *Anderson* balancing test and invalidating New York's voter enrollment scheme, which did not keep data on enrollment in political parties that failed to receive 50,000 votes for their gubernatorial candidates in the previous election); *Unity Party v. Wallace*, 707 F.2d 59 (2d Cir. 1983) (rejecting a First Amendment and Equal Protection challenge to New York's requirement that minor party candidates accept the nomination of the party by a certain date prior to the election).

29

*See* Reply Brief for Appellants at 5 ("As a matter of law, the Term-Limits Amendment, by regulating eligibility requirements for office, necessarily burdens First Amendment activity to at least some degree."). But they ultimately concede, and the law is clear, that they have no First Amendment right to term limits. *See id.* at 5. *Cf. U.S. Term Limits, Inc. v. Thorton*, 514 U.S. 779, 837 (1995) (explaining that the issue of term limits at the state and local level does not implicate the U.S. Constitution). Moreover, their Amended Complaint, in its eighty-six pages, makes no allegation that plaintiffs' First Amendment rights are somehow burdened, even if only in the slightest way, by Local Law 51's substantive change to term limits.

Faced with these insurmountable problems, appellants quickly switch gears and argue that the First Amendment "burdens [do not] flow[] from the substance of the Term-Limits Amendment itself. Rather, they are all the direct result of the *process* by which that law was enacted and, more specifically, of [defendants'] calculated disregard for the voice of City voters." *See* Reply Brief for Appellants at 7. In particular, they argue, defendants' "eleventh-hour undoing of the 1993 and 1996 Referenda has discouraged referenda-related speech, impaired its future effectiveness, and directly frustrated the present exercise of New York City voters' acknowledged right to put the term-limits issue to a third citywide vote." *Id.* Thus, appellants transform the very essence of their claim as they arrive at different junctures of the First Amendment analysis.

We are not persuaded by these efforts. At bottom, plaintiffs challenge New York's equal treatment of law enacted by referendum and law enacted by a legislative body. Such a scheme,

however, does not run afoul of the First Amendment.[11]  Any chilling of plaintiffs' First Amendment activity is self-imposed and thus "incidental[] and constitutionally insignificant." *Cohen v. Cowles Media Co.*, 501 U.S. 663, 672 (1991).

**II.     Substantive Due Process**

Appellants argue next that Local Law 51 violates their substantive due process rights guaranteed by the Fourteenth Amendment of the U.S. Constitution.  Specifically, they argue that because the purpose of Local Law 51 was an "incumbency re-employment program" to allow "those in power to have the opportunity to remain in power," rational-basis review is not applicable.  *See* Brief for Appellants at 36, 38, 40.

The law in this Circuit is clear that "[w]here, as here, a statute neither interferes with a fundamental right nor singles out a suspect classification, 'we will invalidate [that statute] on substantive due process grounds only when a plaintiff can demonstrate that there is no rational relationship between the legislation and a legitimate legislative purpose.'" *Maloney v. Cuomo*, 554 F.3d 56, 59-60 (2d Cir. 2009) (per curiam) (quoting *Beatie v. City of N.Y.*, 123 F.3d 707, 711 (2d Cir. 1997)).  Appellants identify neither a fundamental right nor a suspect classification that is at issue here.  As for a fundamental right, appellants appear to argue that Local Law 51 implicates a right to term limits or a right to be free from law enacted by legislators acting in their own political self-interest.[12]  The Due Process Clause guarantees neither.[13]  As for a suspect

---

[11] Although plaintiffs in fact criticize the City's procedures for holding referenda because "[c]itizens seeking a vote by referendum . . . face an arduous task to merely appear on the ballot, let alone to persuade fellow voters of the desirability of their position," J.A. 54 (Pls. Am. Complt. ¶ 65), they make no legal challenge to that process in the instant suit.

[12] Appellants do not appear to argue that laws enacted by referenda cannot be subsequently amended or repealed by a legislative body without contravening the Due Process

31

class, clearly plaintiffs are not so situated, nor do they suggest otherwise.

To avoid rationality review, appellants argue that it "is deeply inappropriate for legislation that threatens to distort or manipulate regular democratic processes, such as 'when [incumbent] state legislators are passing laws dealing with their own re-election prospects.'" *See* Brief for Appellants at 36 (alteration in original). For this proposition, they rely on a dissenting opinion from the Fourth Circuit's denial of a petition for rehearing *en banc*, *see Miller v. Cunningham*, 512 F.3d 98, 99 (4th Cir. 2007) (Wilkinson, J., dissenting), and the First Circuit's decision in *Bonas v. Town of North Smithfield*, 265 F.3d 69 (1st Cir. 2001). Neither stands for this proposition, and both are entirely inapposite.

Although we need not heed a dissent from the Fourth Circuit's denial of a petition for rehearing *en banc*, we have satisfied ourselves that it is irrelevant to this appeal. In his dissent, Judge Wilkinson addresses a Virginia election law entitling an incumbent state legislator to select the method of nomination for his own seat, to which he was himself eligible to seek reelection. *See Miller*, 512 F.3d at 99-100 (Wilkinson, J., dissenting). Judge Wilkinson appears to opine that it violates the Equal Protection Clause by discriminating in favor of incumbents, as well as the First Amendment rights of political parties to free association. *See id.* at 104-05.

---

Clause of the Fourteenth Amendment. Assuming, *arguendo*, that they do raise such an argument, it must be rejected because there is no fundamental right to pass law by referendum at all. *See supra* **[p. 16]**.

[13] *Cf. U.S. Term Limits, Inc. v. Thorton*, 514 U.S. 779, 837 (1995) (regarding term limits); *Vieth v. Jubelirer*, 541 U.S. 267 (2004) (plurality opinion) (with respect to politically self-interested legislation, holding that political gerrymandering raises a non-justiciable question because, *inter alia*, incumbents pass redistricting legislation with an intent, at least in part, to gain "political advantage," and determining when the motive of "political advantage" reaches an intolerable level is impracticable).

Although appellants cherry pick statements from his dissent that appear to support their position, the dissent, taken as a whole, directly contradicts their argument. Indeed, it explicitly recognizes that the issue of term limits, even if the lack thereof tends to favor incumbents, is not one of constitutional dimension. *See id.* at 104. Moreover, Judge Wilkinson notes:

> [T]here is certainly nothing unconstitutional *per se* about incumbents shaping the electoral process to their advantage. This is merely a feature of American politics. The Framers were surely aware of the desire of those who hold elective office to retain elective office, yet they were clearly comfortable giving incumbents the authority to write election law. Judicial intervention into the electoral process, merely for the purpose of rooting out self-interested political behavior, would therefore be a[] "substantial" incursion into textually and traditionally legislative prerogatives.

*Id.* at 102.

The First Circuit opinion in *Bonas* is equally unhelpful to plaintiffs, as it involves nothing more than the interpretation of state election law. In *Bonas*, the voters of North Smithfield, Rhode Island passed a 1998 referendum switching municipal elections from odd-numbered to even-numbered years starting in the year 2002. *See* 265 F.3d at 71-73. Three school committee members were elected in 1997, each to serve a four-year term in accordance with the election law at that time. *See id.* The committee members asserted that the 1998 referendum "erases any need for an election in 2001." *See id.* at 71. The referendum, however, did not explicitly mention any changes in the election schedule leading up to 2002, nor was any official action ever taken aimed at lengthening the terms for these offices. *See id.* at 72. The defendants, nevertheless, decided not to hold a municipal election in 2001. *See id.* at 73. The plaintiffs sued, seeking to compel the election in November 2001 for those whose terms expired that year. The

court wrote:

> Here, our evaluation of whether such widespread disenfranchisement has occurred starts – and ends – with a question of state law: Do state and local rules mandate an election in North Smithfield for the offices of town council and school committee in the fall of 2001? [If] such an election is required . . . the Town's refusal to hold it would work a total and complete disenfranchisement of the electorate, and therefore would constitute a violation of due process (in addition to being a violation of state law).

*Id.* at 75. The court ultimately concluded that "the language of the referendum requires that the odd-year election cycle continue undisturbed until the year 2002." *Id.* at 77. Thus, *Bonas* holds only that incumbents cannot *sua sponte* do away with an election when state law mandates it. This has nothing to do with the issues presented on this appeal.

Let us be clear. It is indisputable that, as a result of Local Law 51, several Members of the City Council who voted for it and were ineligible to run for reelection under the previous term limits law will now be able to seek reelection in the City's November 2009 election. Some, perhaps even many, of these incumbents may be elected to a third term. Nevertheless, Local Law 51 neither interferes with a fundamental right nor singles out a suspect classification. Accordingly, it is subject to rationality review.

Here, the City's purported reason for enacting Local Law 51 is to provide the voters with an opportunity to elect experienced public officials in a time of financial crisis. It is beyond dispute that extending New York City's term limits to three consecutive terms is rationally related to that legitimate objective. The fact that defendants also may have been motivated by political reasons – the desire to remain in office and in positions of seniority – is inconsequential under our substantive due process analysis. *See Beatie*, 123 F.3d at 712 ("To uphold the

34

legislative choice, a court need only find some 'reasonably conceivable state of facts that could provide a rational basis' for the legislative action.") (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)). We note only that this consideration may well play a part in the voters' decision to vote them back into office (or not).

Finally, plaintiffs make much of the fact that the Mayor and various Council Members have stated that they intend to put the issue of term limits to referendum after the next election cycle in an effort to return the law to a maximum of two consecutive terms. Plaintiffs state that this "one time only deal" violates due process. However, Local Law 51 does not contain a sunset provision; rather, it states that it:

> shall be deemed repealed upon the effective date of a lawful and valid proposal to amend the charter to set term limits at two, rather than three, full consecutive terms, as such limits were in force and effect prior to the enactment of this local law, where such proposal has been submitted for the approval of the qualified electors of the city and approved by the majority of such electors voting thereon.

*See* S.A. 67-68. Of course, the fact that this law may be repealed by a referendum makes it no different than any other law amending the City Charter. We fully agree with the District Court's statement that terming Local Law 51 a "one-time only" measure "does not change [the Due Process] analysis." *Molinari v. Bloomberg*, 596 F. Supp. 2d 546, 571 (E.D.N.Y. 2009).

In conclusion, Local Law 51 does not violate plaintiffs' substantive due process rights guaranteed by the Fourteenth Amendment.

## III. New York State Referendum Law

Plaintiffs argued before the District Court that under Municipal Home Rule Law § 23(2)(b), (e) and (f), the substance of Local Law 51 could be enacted only by referendum. These

35

subsections provide, in relevant part:

> Except as otherwise provided by or under authority of a state statute, a local law shall be subject to mandatory referendum if it:
>
> . . .
>
> b. In the case of a city, town or village, *changes the membership* or composition *of the legislative body* or increases or decreases the number of votes which any member is entitled to cast.
>
> . . .
>
> e. Abolishes an elective office, or changes the method of nominating, electing or removing an elective officer, or *changes the term of an elective office*, or reduces the salary of an elective officer during his term of office.
>
> f. Abolishes, transfers or *curtails any power of an elective officer. . . .*

N.Y. Mun. Home Rule Law § 23(2) (emphasis added). Plaintiffs advanced this challenge under the parallel provisions of the New York City Charter as well.[14]

On appeal, however, appellants have abandoned their arguments with respect to subdivisions (e) and (f), as well as New York City Charter § 38,[15] and argue here only that Local Law 51 "changes the membership . . . of the legislative body," as provided under Municipal

---

[14] New York City Charter § 38 provides, in relevant part, that a referendum is required for the passage of a local law that: "Abolishes or changes the form or composition of the council[,] . . . changes the term of an elective officer, or [a]bolishes, transfers or curtails any power of an elective officer." N.Y. City Charter § 38 (N.Y. Legal Publ'g Corp. 2001).

[15] They make no argument in their opening brief with respect to subdivisions (e) or (f) of section 23(2) of the New York Municipal Home Rule Law or New York City Charter § 38, except for noting in a footnote that if we were to certify the question regarding section 23(2)(b) to the New York Court of Appeals, we should certify the questions regarding the former provisions as well. *See* Brief for Appellants at 48 n.15. Moreover, appellants offer no response in their Reply Brief to appellees' argument that their claims under subdivisions (e) and (f) and New York City Charter § 38 are abandoned. Appellants merely reassert their request for certification. *See* Reply Brief for Appellants at 20-21. In short, they make no argument whatsoever regarding their claims under subdivisions (e) or (f) or New York City Charter § 38. Accordingly, such claims are deemed abandoned. *See, e.g.*, *United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir.), *cert. denied*, 510 U.S. 843 (1993).

Home Rule Law § 23(2)(b).[16] As noted at the outset, the New York Court of Appeals has made clear that local governments have broad power to enact local laws, and direct democracy in New York is the exception, not the rule. *See McCabe v. Voorhis*, 243 N.Y. 401, 413 (1926). Section 10 of the Municipal Home Rule Law provides that city governments shall have the power to adopt and amend local laws relating to "[t]he powers, duties, qualifications, number, mode of selection and removal, terms of office, compensation, hours of work, protection, welfare and safety of its officers and employees." N.Y. MUN. HOME RULE LAW § 10(1)(a)(1). Indeed, the Second Department in *Golden v. New York City Council*, 762 N.Y.S.2d 410 (App. Div. 2d Dep't), *appeal denied*, 793 N.E.2d 411 (N.Y. 2003) held that a referendum was not required to enact Local Law 27 (2002), which amended term limits and had the effect of allowing certain City Council Members to seek reelection who were ineligible under the previous term limit law and, in some instances, to serve two more consecutive years than previously allowed. The parties in that case did not, however, invoke subsection 23(2)(b) of the New York Municipal Home Rule Law. Thus, we are now faced with the question of whether plaintiffs' invocation of this subsection commands a different result than as in *Golden*.

Appellants argue that Local Law 51 "changes the membership of" the City Council because it will inevitably result in the reelection of many incumbents in November 2009 who

---

[16] By pursuing only a claim under Municipal Home Rule Law § 23(2)(b), appellants have necessarily abandoned their argument that extending term limits for the Mayor, Comptroller and Borough Presidents requires a referendum under state law because section 23(2)(b) does not apply to executive officials. *See* N.Y. MUN. HOME RULE LAW § 23(2)(b) (applying only to those laws that "change[] the membership or composition *of the legislative body* . . . .") (emphasis added). Accordingly, appellants' argument relates only to City Council Members and the Public Advocate. *See* N.Y. City Charter §§ 21-22 ("There shall be a council which shall be the legislative body of the city. . . . The council shall consist of the public advocate and of fifty-one other members termed council members.").

37

were ineligible to seek reelection under the previous term limit law. The parties do not dispute that the incumbent reelection rate in New York City is approximately 98%. Appellees offer two responses to this argument. First, they contend that the phrase "membership" refers to structural changes in the legislative body, not changes in the identity of the individuals who constitute it. For example, they claim that an increase or decrease in the number of seats in the City Council would constitute a "change[]" in "membership." Second, they argue that the law in question must directly cause the "change[] in membership" to trigger section 23(2)(b). They contend that Local Law 51 merely permits certain incumbents to run for reelection who were term limited under the previous law, but it is the voters who will cause the "change[]" in "membership" by voting for particular candidates in the November 2009 election. New York State's jurisprudence in this area makes clear that appellees are correct in both respects.

There is no case law interpreting Municipal Home Rule Law § 23(2)(b), which went into effect on January 1, 1964. There is case law, however, interpreting its predecessor, City Home Rule Law § 15(1), which provided, in relevant part, "Except as otherwise provided by or under authority of an act of the legislature, a local law shall be subject to mandatory referendum if it . . . [c]hanges the *form* or composition of the local legislative body . . . ." N.Y. CITY HOME RULE LAW § 15(1) (repealed Jan. 1, 1964) (McKinney's 1952) (emphasis added). The only notable difference between City Home Rule Law § 15 and Municipal Home Rule Law § 23(2)(b) is that the former uses the word "form" where the latter uses "membership."

It is clear, however, that the New York State Legislature did not intend to make a substantive change in the meaning of the provision by virtue of this revision. The passage of New York Municipal Home Rule Law in 1964 consolidated several separate statutes that defined

38

the powers of different types of municipalities. Specifically, it replaced "the City Home Rule Law, the Village Home Rule Law, articles 6 and 6A of the County Law (containing general grants of local law powers to counties) and §§ 51-a though 51-f of the Town Law (containing general grants of local law powers to suburban towns)." N.Y. MUN. HOME RULE LAW § 58 (note). The New York Office for Local Government was assigned the task of drafting the Municipal Home Rule Law. Its stated purpose in drafting the law was to "assure uniformity" in governance among the various types of municipalities and to make it "easier to effectuate" "future amendments and revisions of law . . . since only one law would have to be amended rather than four." *See* Purpose and Scope of Mun. Home Rule Law, Memorandum of N.Y. Office for Local Gov't, *reprinted in* 35C McKinney's Consol. Laws of N.Y., at XI, XIII-XIV (1994); *see also* Analysis of the Mun. Home Rule Law, Memorandum of N.Y. Office for Local Gov't (enacted by L. 1963, c. 843), *reprinted in* 35C McKinney's Consol. Laws of NY, at XV-XXIII (1994).

Furthermore, the Municipal Home Rule Law states that it was not intended:

> to abolish or curtail any rights, privileges, powers or jurisdiction heretofore conferred upon or delegated to any local government or to any board, body or officer thereof, unless a contrary intention is clearly manifest from the express provisions of this chapter or by necessary intendment therefrom, or to restrict the powers of the legislature to pass laws regulating matters other than the property, affairs or government of local governments as distinguished from matters relating to their property, affairs or government.

N.Y. MUN. HOME RULE LAW § 50(3).

With particular respect to section 23 of the Municipal Home Rule Law, New York's Office for Local Government stated:

39

Section 23 is based on City Home Rule Law, section 15, with some clarification in the first subdivision. . . . With respect to matters subject to mandatory referendum, the subjects are as they appear in the City Home Rule Law provision, except that changes are made to adjust the section to the fact that it also applies to counties, towns and villages.

Analysis of the Mun. Home Rule Law, 35C McKinney's Consol. Laws of N.Y., at XXI; *see also*

Home Rule Handbook, N.Y. Office for Local Gov't, Memorandum, *Constitutional Amendment*

*Re Home Rule and Related Legislation*, May 1963, at J.A. 813-15 ("The procedure for adoption

of local laws, the specification of types of local laws subject to referenda (mandatory or

permissive), the restriction and prohibitions against the adoption of local laws would be

substantially as they now are in the City Home Rule Law.").

We conclude, therefore, that the New York State Legislature did not intend a substantive

change by replacing the word "form" as used in section 15 of the City Home Rule Law with

"membership" as used in section 23(2)(b) of the Municipal Home Rule Law. *See, e.g.*, *In re*

*Estate of Horchler*, 322 N.Y.S.2d 88, 90 (App. Div. 2d Dep't 1971) ("[N]o general or material

change in the existing law is intended by a revision, unless the legislative design to accomplish a

change is evident.") (internal citations omitted), *aff'd on op. of App. Div.*, 283 N.E.2d 768 (N.Y.

1972).

It necessarily follows that case law interpreting the former is persuasive as to the proper

interpretation of the latter. These cases demonstrate that a law that has the effect of changing

*who* constitutes a legislative body, as plaintiffs allege Local Law 51 will do, does not "change[]

the form or composition of the legislative body." In *Neils v. City of Yonkers*, 237 N.Y.S.2d 245

(Sup. Ct. 1962), the court addressed whether the changing of ward boundary lines constituted "a

40

change in the form or composition" of the local legislative body under section 15(1) of the City Home Rule Law. *See id.* at 250-51. Even though the changing of boundary lines would appear to affect who would be elected to office, the court held that it did not come within section 15(1) of the City Home Rule Law and so did not require a referendum. *See id.* at 251.

In *Mehiel v. County Board of Legislators*, 571 N.Y.S.2d 808 (App. Div. 2d Dep't), *appeal denied*, 578 N.E.2d 443 (N.Y. 1991), New York's Appellate Division addressed whether a local law passed by the Westchester County Legislature providing for the reapportionment of its legislative districts required a referendum under New York Municipal Home Rule Law § 34(4), which deals with permissive referenda in counties. Like section 15 of the City Home Rule Law, section 34(4) requires a referendum to enact any local law that "changes the form or composition of the board of supervisors of such county." *See id.* at 809. The court held that "[t]he redistricting plan under consideration merely changes the boundary lines of the legislative districts in Westchester County and does not constitute a change in the 'form or composition' of the Westchester County Legislature." *Id.* (internal citations omitted).

We find *Neils* and *Mehiel* especially instructive because redistricting has as much potential to change the individual members of a legislative body as does a change in term limits. Nevertheless, both courts decided that redistricting does not "change[] the form or composition" of the relevant body. This case law leads us to conclude that Municipal Home Rule Law § 23(2)(b) refers to structural changes, and not changes in the identity of the individual members who comprise the legislative body.

We also find persuasive the District Court's discussion of the term "membership" as used in the Optional County Government Law, a New York State statute enacted around the same time

41

as the Municipal Home Rule Law.  This statute, enacted in 1961 but since repealed, provided in relevant part:

> If such city elects to withdraw from the jurisdiction of its civil service commission and adopt the county civil service administration, *the membership of the county civil service commission shall*, on the date on which such change of form of administration by the city becomes effective, *be increased to five members*, all of whom shall be appointed by the county manager, and not more than three of whom shall at the same time be adherents of the same political party.

Chapter 565 (the Optional County Government Law § 1008) (1961), *reprinted in* LAWS OF N.Y., 184th Session, 1961, Vol. 2, at 1787 (emphasis added).  As aptly noted by the District Court:

> It is unlikely that the legislature radically revised its understanding of the term "membership" between 1961 and 1963.  Hence, the 1963 legislature, which passed the Municipal Home Rule Law, conceived of the term "membership" as referring to structural characteristics, including the number of persons in the legislative body.

*Molinari v. Bloomberg*, 596 F. Supp. 2d 546, 572 (E.D.N.Y. 2009).

We also find persuasive the relatively recent New York Court of Appeals decision in *Mayor of City of New York v. Council of City of New York*, 874 N.E.2d 706 (N.Y. 2007).  In 2001, the City Council, over then-Mayor Rudolph Giuliani's veto, enacted Local Laws 18 and 19.  Prior to the enactment of these local laws, the Mayor was required to engage in collective bargaining with City employees through one certified employee organization regarding certain matters.  There was one exception:  the Mayor had to bargain directly with unions representing "uniformed" employees, *e.g.*, uniformed police, fire, sanitation and correction services.  The 2001 local laws, however, expanded the definition of "uniformed" employees to include fire alarm dispatchers and emergency medical technicians.  *See id*. at 707-09.  The Mayor challenged

the local laws on the ground that it was subject to a mandatory referendum under Municipal Home Rule Law § 23(2)(f), which provides: "Except as otherwise provided by or under authority of a state statute, a local law shall be subject to mandatory referendum if it . . . [a]bolishes, transfers or curtails any power of an elective officer." *See id*. at 710.

The Court rejected the Mayor's challenge, reasoning:

> The requirement of a referendum for legislation that "curtails any power of an elective officer" must be read as applying only to legislation that impairs a power conferred on the officer as part of the framework of local government.  For example, a local law limiting the power of New York City's Mayor to appoint commissioners, or to prepare a budget, or to create or abolish positions within his executive office would require a referendum (see N.Y. City Charter §§ 6, 8 [f]; § 225 [a]).  But, as a general rule, a law that merely regulates the operations of city government, in collective bargaining or in some other area, is not a curtailment of an officer's power. . . .
>
> *So here, the Mayor's power in the New York City governmental structure is unimpaired.  A local law prescribing a procedural rule for collective bargaining is not an encroachment on the Mayor's role in City government.  The limitation on his freedom to act is merely a consequence of legislative policymaking.  By contrast, the cases the Mayor relies on all involved limitations on an elected officer's structural authority.*

*Id.* at 711 (internal citations omitted) (emphasis added).  Thus, the New York Court of Appeal's analysis clearly emphasizes Municipal Home Rule Law § 23(2)'s concern with structural changes made by law, as opposed to an incidental consequence of a law.

Based on these authorities, we agree with appellees that the term "membership" as used in Municipal Home Rule Law § 23(2)(b) refers to the structural characteristics of the legislative body.  A structural change to the "membership" might occur, for example, where a law directly

43

increases or decreases the number of seats in the legislative body.[17] Local Law 51, however, affects only an incumbent's eligibility to seek reelection.

Even assuming, *arguendo*, that the term "membership" as used in the statute refers to the specific individuals constituting a legislative body, as appellants suggest, Local Law 51 does not trigger Municipal Home Rule Law § 22(2)(b) because it does not directly change the membership; rather, the election results in November 2009 will cause this change. *See Lane v. Johnson*, 28 N.E.2d 705 (N.Y. 1940).

In *Lane*, the Village of Peekskill, which was part of the Town of Cortlandt, decided to form its own city, the City of Peekskill. It drafted a charter with that effect, which provided, *inter alia*, for the election of two supervisors who were defined thereunder as "City officers." *See id.* at 710-11. Under New York law at the time, "[t]he supervisors of the cities . . . in each county, when lawfully convened, [were also] the board of supervisors of the county." *See id.* at 711 (internal quotation marks omitted). Thus, when the two supervisors were elected as

_____

[17] We note that City Charter § 22 provides that "the size of the council . . . may be increased by local law without approval" by the electors in a referendum. *See* N.Y. City Charter §§ 22, 38 (N.Y. Legal Publ'g Corp. 2001). On its face, this seems to conflict with section 23(2)(b), though appellants do not raise this argument. We need not resolve this conflict. We note, however, by its express terms section 22 is subject to state law. *See* N.Y. City Charter § 22 ("*Consistent with state law*, the size of the council and the number of districts from which council members are elected may be increased by local law without approval pursuant to section thirty-eight.") (emphasis added); *see also id.* § 28 ("The council in addition to all enumerated powers shall have power to adopt local laws which it deems appropriate, *which are not inconsistent with the* provisions of this charter or with the constitution or *laws of* the United States or *this state*, for the good rule and government of the city;") (emphasis added); *see also* N.Y. Mun. Home Rule Law § 10 (enumerating powers and limits of local government). Moreover, the New York Court of Appeals has long held that a city charter cannot be "inconsistent with [the] laws of the State." *People v. Lewis*, 64 N.E.2d 702, 703 (N.Y. 1945); *see also Fossella v. Dinkins*, 485 N.E.2d 1017, 1018-19 (N.Y. 1985) (per curiam). Thus, any analysis of section 22 of the City Charter would in turn implicate state law, including New York Municipal Home Rule Law § 23.

44

Peekskill "City officers," they also became members of the Board of Supervisors of the county, thereby increasing the number of supervisors on the county Board. *See id.* The plaintiffs argued that the Peekskill charter violated New York law prohibiting any law "which . . . changes the form or composition of the elective body of such county . . . without adoption by the electors of such county . . . ." *See id.* The Court of Appeals rejected the argument, writing:

> [The City of Peeskill] has not by the special or local law . . .
> changed in any manner any provision of law which fixes the form
> of county government of Westchester or the form or composition
> of any elective body. It has merely exercised its power to
> incorporate a city[;] and by force of the provisions of the general
> law which determines the form or composition of the Board of
> Supervisors, city officers become members of the Board of
> Supervisors and thus the number of members of the Board of
> Supervisors is increased.

*Id.* at 712.

As in *Lane*, Local Law 51 is not what works the change in the membership of the City Council. Rather, any effect caused by Local Law 51, although real, is indirect. The change will be caused by the November 2009 election results. Local Law 51 affects only certain candidates' eligibility to seek reelection. It is of no moment that a number of formerly term-limited Council members will likely – indeed, almost certainly – win reelection because of the opportunity afforded them by Local Law 51. The City's argument in this regard appears to us to be unassailable: "If merely changing the likelihood that particular individuals will serve in the future constitutes 'changing' the Council's membership or composition, then a host of other legislation with similar spillover effects – campaign finance changes, for one example – would also need voter approval." Brief for Defendants-Appellees Michael R. Bloomberg, *et al*. at 4. This conclusion is consistent not only with *Lane* but also with the redistricting decisions in *Niels*

45

and *Mehiel*. Clearly redistricting is likely to have the ultimate effect of changing who will run and sit in a legislative body, but New York courts have held it does not require a referendum.

For all the reasons discussed, we hold that section 23(2)(b) of New York Municipal Home Rule Law does not require a referendum to enact Local Law 51. We decline appellants' invitation to certify the interpretation of this provision to the New York Court of Appeals. "Despite our discretionary authority to certify, certification is an exceptional procedure, to which we resort only in appropriate circumstances." *McGrath v. Toys "R" Us, Inc.*. 356 F.3d 246, 250 (2d Cir. 2004) (citing *Krohn v. N.Y. City Police Dep't*, 341 F.3d 177, 180 (2d Cir. 2003)). "In the past, we have certified questions to the New York Court of Appeals only where there is a split of authority on the issue, where the statute's plain language does not indicate the answer, or when presented with a complex question of New York common law for which no New York authority can be found." *Riordan v. Nationwide Mut. Fire Ins. Co.*, 977 F.2d 47, 51 (2d Cir. 1992).

These circumstance are not present here. We are confident as to how the New York Court of Appeals would rule on this issue in light of the presumption of representative democracy in New York, the plain meaning of the statute, its legislative history, the holdings in *Niels* and *Mehiel*, the meaning of the term "membership" as used in the Optional County Government Law § 1008 and the New York Court of Appeals decisions in *Mayor of City of New York v. Council of City of New York* and *Lane v. Johnson*. Conversely, there is a complete absence of authority suggesting that the New York Court of Appeals would hold that section

46

23(2)(b) is triggered by Local Law 51.[18]  Accordingly, we perceive no benefit from certifying this question to the New York Court of Appeals because we are in a position to conclude with sufficient certainty what it would hold.  That is, New York Municipal Home Rule Law § 23(2)(b) does not require a referendum to enact Local Law 51.

**IV.     Conflict of Interest**

Finally, plaintiffs allege that defendants violated the conflicts of interest provisions set forth in Chapter 68 of the City Charter, § 2604(b)(2), (3), as well as Conflicts Board Rule 1-13(d) ("Rule 1-13(d)").

The provisions provide, in relevant part:

> 2. No public servant shall engage in any business, transaction or private employment, or have any financial or other private interest, direct or indirect, which is in conflict with the proper discharge of his or her official duties.

---

[18] Appellants rely exclusively on *Forti v. New York State Ethics Commission*, 554 N.E.2d 876 (N.Y. 1990), in which the New York Court of Appeals addressed the constitutionality of the Ethics in Government Act, to argue that Local Law 51 implicates "membership" as used in section 23(2)(b).  In *Forti*, the plaintiffs claimed, *inter alia*, that the Act violated the Equal Protection Clause because its "revolving door" rules treated former executive employees more stringently than former legislative employees.  *See id.* at 878-79.  The New York Court of Appeals rejected this argument, explaining, *inter alia*, that the disparate treatment could be justified by "the fact[] that each legislator is personally accountable to his or her constituency and *that the Legislature itself is reconstituted every two years with an attendant change in membership, political orientation and priorities*."  *Id.* at 883 (emphasis added).  Honing in on this language, appellants argue that "change[] in [] membership" must mean a change in the individual members.  However, the mere happenstance that the New York Court of Appeals used the word "membership" in the latter context to mean change in the legislature's individual members carries little, if any, weight with respect to the proper interpretation of New York Municipal Home Rule Law § 23(2)(b), which was not even remotely at issue in *Forti*.  Moreover, even assuming that a change in "membership" encompasses a mere change in the individual members, *Forti* reinforces our conclusion that the November 2009 election, not Local Law 51, is what will affect that change.  *See Forti*, 554 N.E.2d at 883 (referring to a change in membership every two years as a result of elections).

3. No public servant shall use or attempt to use his or her position as a public servant to obtain any financial gain, contract, license, privilege or other private or personal advantage, direct or indirect, for the public servant or any person or firm associated with the public servant.

City Charter § 2604(b)(2)-(3) (N.Y. Legal Publ'g Corp. 2001). Rule 1-13(d) provides that "[i]t shall be a violation of City Charter § 2604(b)(2) for a public servant to intentionally or knowingly[] . . . aid, induce or cause another public servant to engage in conduct that violates any provision of City Charter § 2604." N.Y. Board of Conflicts Rule 1-13(d), *available at* http://www.nyc.gov/html/conflicts/downloads/pdf3/Rules%20Amendments%20by%20Rule%20 Number/1_13.pdf.

Prior to voting on Local Law 51, Council Members de Blasio and James and Public Advocate Gotbaum filed an inquiry with the City of New York Conflicts of Interest Board (the "Board"), requesting an advisory opinion as to whether Council Members and the Public Advocate would violate these provisions by voting on the bill. On October 15, 2008, the Board issued Advisory Opinion No. 2008-3 ("Advisory Opinion"), holding that Members of the City Council would not violate the conflict rules by voting on Local Law 51. Specifically, it held:

> [I]t is the Board's view that their official actions in participating in a legislative process that might yield them this arguable benefit [of an extra term] would *not* confer upon them any "private or personal advantage" within the meaning of Charter Section 2604(b)(3), nor would it constitute a "private interest" in conflict with the proper discharge of their official duties in violation of Charter Section 2604(b)(2).

*Id.* at 773. The Board concluded that "it is squarely *within* the proper discharge of Council Members' official duties as legislators (and, in Ms. Gotbaum's case, as an elected official whose duties include presiding over the Council) for them to vote upon, and otherwise participate in the

legislative process regarding, a bill lawfully pending before the Council." *Id.* It wrote, "while term-limited elected officials may have a personal political interest in the Bill's outcome, that interest does not fall within the 'definable and crucial subset' of Chapter 68 that would disqualify them from participating in consideration and possible enactment of the proposed legislation." *Id.* The Board also cited *Golden v. New York City Council*, 762 N.Y.S.2d 410 (App. Div. 2d Dep't), *appeal denied*, 793 N.E.2d 411 (N.Y. 2003), in which the Appellate Division held that the City Council had authority to enact laws regarding term limits. *See id.* at 775. The Board concluded: "Given this judicial authority, to hold that all Members of the Council who would arguably benefit by being enabled to run for another term are disqualified by Chapter 68 from voting on such a law would deny to the people's elected representatives one of the powers afforded them by State and local law." *Id.* The Board commented that, if plaintiffs' position were correct, "it [would] follow that they could not vote on *any measure* affecting the terms and conditions of their public service as Council Members." *Id.* at 776-77. But this is not the case, the Board explained, as Council Members can vote on pay raises, campaign contribution limits, ethics rules regarding lobbyists, etc. *See id.* at 777. Otherwise, it opined, "democratic government" would come "to a halt." *Id.*

Displeased with the Board's conclusions, plaintiffs assert three causes of action in their Amended Complaint seeking a declaratory judgment that defendants violated City Charter § 2604(b)(2) and(3) and Rule 1-13(d) by proposing and/or voting upon Local Law 51, and that the Law is therefore invalid. They allege that defendants violated the conflict provisions by voting on legislation that resulted in pecuniary benefits, including six-figure salaries, substantial benefits package and additional annual financial allowances. They also allege that defendants will gain

49

an "increase in the political cache wrought by additional years spent in the public eye, which unquestionably serves to increase future political and employment prospects for these public servants." *See id.* at 111, 112 (Pls. Am. Complt. ¶¶ 317, 322). With respect to Mayor Bloomberg, plaintiffs allege that "[t]he Mayor's political dealings to guarantee the passage and enactment of the Term-Limits Amendment, including, but not limited to, his deal with Ronald Lauder and City Council Speaker Christine Quinn, also involved the use of his position to confer upon himself other direct and indirect forms of 'financial gain' and 'private or personal advantage.'" *Id.* at 112 (Pls. Am. Complt. ¶ 323).

The District Court held that a private right of action existed under Chapter 68 of the Charter, but dismissed plaintiffs' claims essentially for the reasons stated by the Board in its Advisory Opinion. *See Molinari v. Bloomberg*, 596 F. Supp. 2d 546, 577-82 (E.D.N.Y. 2009). In doing so, the court gave considerable weight to the conclusions of the Board. *See id.* at 579-80. Appellees argue that the District Court was correct on the merits but contend that we need not reach these questions because no private right of action exists under Chapter 68 of the City Charter.

Assuming, without deciding, that a private right of action exists under Chapter 68 of the City Charter, we hold that the District Court properly dismissed plaintiffs' claims under City Charter § 2604(b)(2) and(3) and Rule 1-13(d). First, we note that the District Court properly deferred to the Board's conclusions. *See DiLucia v. Mandelker*, 493 N.Y.S.2d 769, 771 (App. Div. 1st Dep't 1985) (noting that the Board's "opinions should be given considerable weight by the courts. . . . [T]he conclusion is plain that absent a clear showing to the contrary, advisory opinions of such agencies should be given great deference and validity."), *aff'd for reasons stated*

50

*below*, 501 N.E.2d 32 (N.Y. 1986).  Here, plaintiffs have failed to make a "clear showing" that the Board was incorrect.

The cases and Board opinions cited by appellants make this clear.  In each one, the interest served by the public servant's official actions resulting in a conflict was a *personal, private* interest, not an interest in the terms and conditions of his or her public office.[19]

---

[19] *See Baker v. Marley*, 170 N.E.2d 900 (N.Y. 1960) (finding violation where mayor participated in meetings of village board, which adopted resolutions leading to the condemnation of various parcels of real property, including one owned by the mayor from which he stood to gain financially); *Zagoreos v. Conklin*, 491 N.Y.S.2d 358, 363-64 (App. Div. 2d Dep't 1985) (finding violation where determinative votes on construction-related applications to town and zoning boards were cast by board members who were employees of the construction company); *Tuxedo Conservation & Taxpayers Ass'n v. Town Bd. of Town of Tuxedo*, 418 N.Y.S.2d 638 (App. Div. 2d Dep't 1979) (finding violation where town-board member voted on a multi-million dollar construction project from which his advertising company stood to gain financially); *In re Sanders, Jr.*, COIB Case No. 2005-442 (May 31, 2007) (finding violation where New York City Council Member, having married his Chief of Staff, continued to employ her in that capacity, as his subordinate, in direct violation of the City's conflict of interest provision); *In re Sass*, COIB Case No. 98-190 (June 29, 1999) (finding violation where Director of Administration of the Manhattan Borough President's Office used her position to authorize the hiring of her own private company to clean the Borough President's offices); *In re Ross*, COIB Case No. 97-76 (Dec. 22, 1997) (finding violation where Assistant District Attorney issued a false grand jury summons to a police officer to interfere with his scheduled testimony against the Assistant's husband in traffic court on the same day); Advisory Opinion 94-17 (July 11, 1994) (advising that member of City commission should not vote on an application submitted by a private company for a project that a not-for-profit corporation with which he had a financial relationship publicly supported); Advisory Opinion 93-21 (July 12, 1993) (advising that a Council Member was not permitted to nominate a family member for appointment to a community board because it could create an appearance that the Council Member was securing a private advantage for someone with whom he or she was associated); Advisory Opinion 90-04 (April 16, 1990) (advising then-Mayor of the City of New York to recuse himself from matters before the Board of Estimate concerning the renewal of two Manhattan cable franchises in which Time Warner, Inc. had an interest because the Mayor had an indirect financial interest in Time Warner); *cf. George v. City of Cocoa, Fla.*, 78 F.3d 494, 498 (11th Cir. 1996) (holding that city council member in Florida did not have conflict barring him from voting on a redistricting plan because of his political interests as an incumbent planning to run for reelection in one of the new single member districts, reasoning, *inter alia*, that every one of the incumbent city council members had such an interest and it would be "absurd" to interpret Florida's voting conflicts statute in such a way that would disqualify all members of legislative bodies from participating in legislative redistricting

Appellants rely heavily upon Advisory Opinion, 95-24 (Oct. 30, 1995), but that opinion is inapposite. It advises only that Council Members may use City employees and resources in conducting non-partisan voter registration drives, as long as no partisan political activity is conducted during the drives which would promote the interests of a particular Council Member, elected official or candidate for elective office. The Board opined that "if the voter registration drives were to be used to promote the political campaign of Council Members or others, it would constitute a conflict of interest for the Council Members to ask their aides to participate in such drives . . . . " J.A. 619.

Appellants cite this opinion for the proposition that City Council Members can violate the City Charter's conflict of interest provisions when engaging in purely political activity. As is clear, this opinion relates to the use of public monies for private campaigns and has nothing at all to do with the present case.

Plaintiffs stress that Local Law 51 is particularly egregious because it provides a one-time benefit to those who voted for it. However, as noted *supra*, Local Law 51 does not contain a sunset provision; it merely states that it can be repealed by a subsequent referendum.

Finally, plaintiffs rehash their allegations regarding Mayor Bloomberg's communications with Mr. Lauder. However, as the District Court stated, even if these allegations were true, they would not establish a violation of Chapter 68. "The Mayor's alleged 'benefit' was a former opponent's support for a piece of legislation, not a personal or financial reward in his private capacity." *Molinari*, 596 F. Supp. 2d at 580. We agree.

Accordingly, the District Court properly dismissed plaintiffs' claims under City law

decisions).

52

alleging that defendants had a conflict of interest in violation of sections 2604(b)(2) and (3) of the City Charter and Rule 1-13(d).

**CONCLUSION**

Local Law 51 has no doubt stirred controversy. Some feel that it disregards the will of the people as expressed by the 1993 Voter Initiative and 1996 Referendum. That may be a justifiable reaction. But it is not the role of this Court to interject itself into city politics. We shall only adjudicate the constitutional and legal claims properly before us, which we have analyzed exhaustively.

For the foregoing reasons, we AFFIRM the District Court's judgment granting defendants' motion for summary judgment and dismissing plaintiffs' Amended Complaint.